## QUIDNICK COMPANY *vs.* ZECHARIAH CHAFEE *et als.*

Q. and S. entered into a contract by which Q. was to furnish S. stock, means, and supplies to run the mills of S. S. to manufacture such stock and supplies into prints, and consign the prints in the name of Q. to commission merchants to be agreed on, for sale on account of Q.; the stock, supplies, and goods till sold to remain the property of Q.; the proceeds of sale as received by Q. to be applied to pay freight, insurance and expenses, then to repay advances from Q. to S., including a commission. of one fourth of one per cent. on such advances, the balance of the proceeds to be paid to S. as his compensation. The contract to be terminable by either party on thirty days' notice.

There being no charge of negligence, non-performance, or conversion:

*Held*, that under the contract no debt could arise from S. to Q. POTTER, J., dissenting.

C., the treasurer of the Q. corporation, was also trustee and assignee for the benefit of the creditors of most of the stockholders in the Q. corporation. C. held in pledge most of the stock of the Q. corporation for such creditors.

It appearing that funds of the Q. corporation had been used for the trust estate in C.'s hands:

*Held*, that the Q. corporation was entitled to a lien on the trust estate for the amount of such funds and to an account.

It further appearing that the trust estate could not be held to await such account without great loss, the court ordered the trust estate sold and the lien transferred to the proceeds. POTTER, J., dissenting from the order.

---

A portion of the trust estate in C.'s hands was realty situated in Connecticut, under attachment in suits pending in that State.

It appearing that this realty could not be at once sold and that its maintenance involved expense, the court authorized C. to lease the realty and approved a form of lease submitted by him. POTTER, J., dissenting.

When proceedings at law and in equity are pending between the same parties and for the same cause of action, the court, on motion, will compel an election of remedies; and when the equity proceedings have been carried to hearing and decree, the court, on motion, will enjoin the prosecution of the suits at law, and will order the discharge of any attachment made in them.

Such order made in the present case. POTTER, J., dissenting on the ground that the facts did not justify it.

A decree entered by the court cannot be suspended or modified by an injunctive order issued by a single justice. POTTER, J., doubting.

C. holding as trustee, for the benefit of creditors, a large estate of realty and personalty, applied to the court for its approval of a plan to sell the whole estate in bulk.

It appearing that the creditors desired this mode of sale, that the trustee favored it, and that the debtors assented to it:

*Held*, That the court would approve it; that the trustee should fix a time and place to receive competitive offers for the estate, and should contract to sell to the highest bidder. POTTER, J., dissenting in the circumstances.

Terms and conditions stated which such a contract to sell should contain.

C. subsequently received from W. an offer to bid at auction a given sum as an upset price for the estate in bulk. This offer was favored by the creditors, and was submitted to the court by C. with the knowledge of W., whereupon the former order of sale was modified to meet the conditions of W.'s offer.

The day before the auction sale W. annulled his offer, and the sale was thus frustrated. *Held*, that W. was guilty of a contempt of court.

BILL IN EQUITY to establish a lien and for an account.

By deed of trust, bearing date November 1, 1873, the A. & W. Sprague Manufacturing Company, William Sprague, Amasa Sprague, Mary Sprague, Fanny Sprague, and the firm of A. & W. Sprague, conveyed certain property to Zechariah Chafee, giving him power to execute notes for the indebtedness of the grantors, to sell the property conveyed in case of default in the payment of these notes, and, meanwhile, to carry on the business of the grantors for the benefit of their creditors. Subsequently all the grantors, except Mary Sprague and Fanny Sprague, executed deeds of assignment for the benefit of their creditors to said Chafee of all their property not exempt from attachment by law. These grantors held most of the capital stock of the Quidnick Company, a solvent corporation. In pursuance of the general plan, of which the above trust deed was a part, Chafee was chosen treasurer of the Quidnick Company, and the following agreement was made between the Quidnick Company and the A. & W. Sprague Manufacturing Company:

" It is agreed between the Quidnick Company and the A. & W. Sprague Manufacturing Company, a corporation created by the General Assembly of the State of Rhode Island, as follows:

" That said Quidnick Company will, from time to time, furnish the said A. & W. Sprague Manufacturing Company the necessary means, stock, and supplies for running their mills and print works so long as this contract shall continue in force.

" That said A. & W. Sprague Manufacturing Company will manufacture all such stock and supplies into printed goods, and consign the same as fast as manufactured, in the name of the Quidnick Company, to such commission houses as may be agreed upon, for sale on account of said Quidnick Company, said stock and supplies, and goods in process or manufactured, at all times till sold, to be and remain the property of said Quidnick Company.

" That the proceeds of sales of said goods as received by said Quidnick Company, shall be applied, first to the payment of freight, insurance, and other expenses, and to the repayment of all advances made by them as aforesaid, including a commission of one quarter of one per cent. upon the amount of such advances for their trouble; and the balance of said proceeds shall, from time to time, be paid over to said A. & W. Sprague Manufacturing Company as its compensation for manufacture.

" And it is further agreed that this contract shall continue in force until terminated by thirty days' notice, in writing, by either party to the other party of its intention to terminate the same.

" In testimony whereof said Quidnick Company has caused these presents to be signed, and its corporate seal to be hereunto affixed by Zechariah Chafee, its treasurer, for this purpose duly authorized. And said A. & W. Sprague Manufacturing Company has caused these presents to be signed, and its corporate seal to be hereto affixed by Amasa Sprague, its treasurer, for this purpose duly authorized, this eighteenth day of December, A. D. 1873.

" ZECHARIAH CHAFEE, *Treasurer.* [SEAL.]

" AMASA SPRAGUE, *Treasurer.*        [SEAL.]

" Executed and delivered in presence of
    CHARLES B. GOULD."

The complainant, in this bill in equity, claimed that under this

contract large sums of money were due to the Quidnick Company; that much of this money had been used by Chafee for the benefit of the holders of the extension notes issued by him under the powers contained in the deed of trust, and for the purposes and benefit of the trust estate conveyed to him.   The bill prays that a lien on the trust estate may be decreed in favor of the complainant, that an account may be taken, and that Chafee may, meanwhile, be enjoined from selling and encumbering in any way the trust estate.

The pleadings involved many other matters charged in the bill, and denied or explained in the answer, arising from the connection of the parties with other persons and corporations.   A statement of these matters is immaterial in view of the decision and decree of the court.

*October* 15, 1881.   STINESS, J.   This bill seeks to charge with a lien, in favor of the complainant, all the estate which was conveyed to Chafee in trust for the creditors of the A. & W. Sprague Manufacturing Company and its individual members, setting up as the foundation for its claim of lien a contract for furnishing " the necessary means, stock, and supplies for running their mills and print works," upon which it is claimed that a large balance is due to the Quidnick Company ; and also an appropriation of the funds of the Quidnick Company by Chafee, who was formerly its treasurer, for the benefit of the trust estate.

The first question that meets us is whether there is any debt due to the Quidnick Company from the A. & W. Sprague Manufacturing Company, under the contract.

The contract in question is what is commonly known as a stocking contract, and, though it is quite meagre in its details, it clearly provides that the A. & W. Sprague Manufacturing Company is to manufacture goods for the Quidnick Company ; that the latter is to furnish all the stock, supplies, and funds necessary to do this, and is to own all the stock, supplies, and goods, in process or manufactured at all times till sold, and is to have the proceeds of the sales ; that out of the proceeds all expenses and advances are to be paid ; also one quarter of one *per centum* on the amount of the advances for its trouble, and the balance, if any, is to go to the A. & W. Sprague Manufacturing Company, " as its compensation for manufacture."   In other words, the Quidnick Company was

to have its own stock and supplies manufactured in the Sprague mills. If there was a profit, the Sprague estate would get something for the use of its mills and for its supervision; but if there was no profit, the silence of the contract on that point is significant. Under such a contract what debt could arise to the Quidnick Company? If the goods sold for more than the expenses and commissions, not only would there be no debt under the contract, but there would be a balance due to the A. & W. Sprague Manufacturing Company. If the goods sold for less than it cost to produce them, we cannot see how the A. & W. Sprague Manufacturing Company becomes in any way liable for the deficiency.

Take a simple illustration. A. has corn. B. has a grist-mill. A. says to B.: "Grind my corn into meal; I will pay all expenses, and if the meal brings more than a certain price, you shall have the excess for your trouble." Now, suppose there is a fall in the grain market, or that B.'s machinery for grinding is of such a kind as to make the cost for labor more than in other mills, so that A. finally loses money in the operation; clearly he could have no claim on B. for the loss. And yet this simple arrangement is not essentially different from the contract before us. The manufacture and printing of cotton goods has more complication of details, but in substance the Quidnick Company, by this contract, said to the A. & W. Sprague Manufacturing Company: "Make our cotton into prints in your mills, we paying all expenses. If on sale they bring more than a certain price, you shall have the excess." By necessary implication, therefore, it also said: "If they bring less than cost, it is our own loss, because our own goods have brought less than we have put out on them."

We see nothing in the contract to make the A. & W. Sprague Manufacturing Company liable for any loss incurred in the manufacture of the goods, and from the nature and terms of the contract, that is the only kind of debt that could be claimed to have arisen under it. No accounting is provided for in the contract, and the only security mentioned is that of title in the stock and goods. By this arrangement all advances for labor and incidental expenses would be secured in the enhanced value of the stock as manufactured goods. So long as both parties fulfilled the contract, the Quidnick Company would have its own property and the proceeds of sales.

The only losses, other than those which might come from the chances of business, which the Quidnick Company could sustain under this contract, would be from negligence or non-performance on the part of the A. & W. Sprague Manufacturing Company, or a failure to deliver back the property intrusted to it, which would be a conversion.

But none of these things are charged in the bill. On the contrary, this particular indebtedness is claimed to have arisen " under the contract and authority above stated," and, as we must therefore assume, pursuant the contract and not in violation of it or in fraud.

But if there is nothing in the contract to show that the A. & W. Sprague Manufacturing Company was to be held for losses in the business, is there anything in the situation of the parties or the character of the arrangement to show that such was their implied understanding, though not specifically expressed ? The A. & W. Sprague Manufacturing Company was " financially embarrassed ; " it was without credit; its stockholders had pledged nearly the entire stock of the Quidnick Company for their debts ; it had made conveyance of all its property in trust for its creditors, and was compelled to enter into this scheme in order to keep its mills from rusting in idleness. Under such circumstances it is impossible to suppose that the Quidnick Company, composed almost entirely of the same stockholders as the A. & W. Sprague Manufacturing Company, and lending its name and credit to carry the project into operation, was looking to the ultimate liability of an insolvent corporation as a guaranty against loss in furnishing stock, &c., for the manufacture of its own goods. Was it looking to reimbursement from the trust estate ? There is no suggestion of it in the contract, and if so valuable a security was contemplated, it is incredible that it could have been omitted, or that the parties would have trusted to the remote and doubtful inference of liability of the trustee, who, as such, was no party to the contract, from the simple fact that the creditors knew of and assented to the agreement.

It appears that accounts were kept by these corporations, as though they understood the relation of debtor and creditor to exist between them, and the answer admits an " apparent indebtedness " on such account of about one million dollars, subject to

deductions not ascertained ; and in the argument counsel on both sides seemed to assume that a debt would remain, under the contract, against the A. & W. Sprague Manufacturing Company, in case of deficiency or loss in the closing of the account.

It might be claimed from these facts that the parties themselves had shown their understanding of the contract, and thus had given a construction to it which the court should adopt. We do not think, however, that the facts warrant such an inference.  As the A. & W. Sprague Manufacturing Company was to have a portion of the proceeds of sales in case of profit, it would be necessary to keep accounts in order to determine whether there were any profits ; and we do not understand that the accounts as kept amounted to anything more than this.  An " apparent indebtedness " might be shown in such accounts without any implication of liability for the balance so disclosed.  The contract to be construed by the court is simple, definite, and unambiguous, and requires no guide to its meaning from extrinsic facts.  Neither do we think that any of the facts before us are inconsistent with the plain meaning of the contract as we have read it.

The bill also charges that said Chafee " incurred an unexplained loss of about two million dollars."  If this means a loss in the manufacture of goods under the contract, from what we have already said, there would be no debt accruing to the complainant, and, therefore, no lien for it.  If it means that there has been a loss to the Quidnick Company outside of the contract, and in some other way, it would come under the second branch of the case, which we will now consider.

The bill charges that " the earnings belonging to said Quidnick Company of itself, and the earnings belonging to said Quidnick Company under the contract above referred to, have either been paid to said creditors holding the said extension notes, or have been used by said Chafee as trustee and assignee, as aforesaid, in preserving and carrying on the business of said A. & W. Sprague Manufacturing Company, and for the sole benefit and advantage of its creditors, to the loss, injury, and damage of said Quidnick Company."

We do not find that this is specifically denied in the answer.  The defendants do " deny that the A. & W. Sprague Manufactur-

ing Company is indebted to the Quidnick Company in the sum of more than two million dollars," as charged in said bill, but they admit that upon the accounts, as they now stand, there is an apparent indebtedness from said A. & W. Sprague Manufacturing Company to said Quidnick Company of about one million dollars," subject to deductions for unascertained credits, which they claim will be sufficient to cover the indebtedness.

The answer does not state how this "apparent indebtedness" has arisen, whether under the contract or in the way charged in the bill ; and, of course, we cannot now know whether the credits will be sufficient to cover the indebtedness or not.

Upon this branch of the case we think that the complainant is entitled to an account.

If the defendant, Chafee, by virtue of his position as treasurer of the Quidnick Company, has used its funds for the benefit of the trust estate, the Quidnick Company is entitled to have the amount so appropriated ascertained and repaid. But the defendants say, even if there was an indebtedness of this kind, still as Chafee holds the whole of the Sprague estates in trust for creditors, and 4,022 shares out of 4,349 of the Quidnick Company in pledge for the same creditors, and as the Quidnick Company has entered into this scheme above referred to "for continuing in operation the manufacturing business and print works, and keeping in activity the Sprague properties for the benefit of creditors," it is practically one concern, one estate, and that an accounting from one company to the other would simply be taking from one pocket to put into another, involving circuity of remedy and unnecessary delay. Perhaps this may be so, but upon the record before us we do not see that we have any authority to treat the two companies as one, if, indeed, we could do it under any circumstances.

Three hundred and twenty-seven shares of the Quidnick Company belong to the estate of Edwin Hoyt, and, so far as appears in this case, neither was he, nor are his representatives, interested in the trust estate. As owners in the Quidnick Company, those representatives are entitled to their proportion of its earnings and property, and to the full benefit accruing to it under the contract. They have not waived any of their rights, and for all that appears before us, may properly claim their share in the Quidnick Com-

pany. Certain reasons were suggested by counsel in argument why no action has been taken in behalf of the Hoyt estate to demand its rights in the Quidnick Company, but we find nothing in the record to warrant us in ignoring their rights in it or in dealing with it as if such rights had been abandoned or did not exist.

The Quidnick Company then stands as a distinct and independent corporation, with other stockholders than those of the A. & W. Sprague Manufacturing Company, and entitled to its own earnings and property, as well from the A. & W. Sprague Manufacturing Company and the trustee of the Sprague estates as from others. As such, upon this record, it is entitled to an account, such as we have stated, and is also entitled, in order to secure such account, to a lien upon enough of the trust estate to satisfy the balance of the account when found, or to some other equivalent remedy.

TILLINGHAST, J., concurred.

POTTER, J., dissenting. In 1873, the A. & W. Sprague Manufacturing Company, A. & W. Sprague as a firm, Amasa Sprague and William Sprague individually, and Fanny Sprague and Mary Sprague; the first corporation being composed of the firm and individuals subsequently named; in order to fund and secure their indebtedness, executed a trust mortgage of all their property, describing it, dated November 1, but executed on or about December 2, to Chafee, one of the respondents, with provisions to execute promissory notes of various amounts to the whole amount of                      which notes were secured by said mortgage and were to be "used and applied to the payment or retiring of such of the outstanding indebtedness and liabilities aforesaid as the holders thereof shall, within nine months from the date of these presents, bring in and surrender and discharge or agree to extend for the term and according to the provisions of said notes." The subsequent assignments do not affect any rights of parties so far as the present suit is concerned.

December 18, 1873, the Quidnick Company, which was composed in part of the foregoing persons and firm, but which was solvent as a corporation, according to a plan agreed upon by the complainant, the A. & W. Sprague Manufacturing Company and

A. & W. Sprague and the creditors made a contract with the A. & W. Sprague Manufacturing Company, corporation, by which, in order to carry on the business for the benefit of the creditors, the Quidnick Company were, for a commission, to furnish to the A. & W. Sprague Manufacturing Company, " the necessary means, stock, and supplies for running their mills and print works," the A. & W. Sprague Manufacturing Company to manufacture and consign them in the name of the Quidnick Company, the goods to remain the property of the latter, and the proceeds to be applied, first to the payment of expenses, commission, and advances, and the remainder to be paid to the A. & W. Sprague Manufacturing Company as a compensation for manufacturing; the contract to be terminable on thirty days' notice.

On the same day Amasa Sprague resigned his place as treasurer of the Quidnick Company, and Chafee, the trustee under the mortgage, was elected in his stead, thus giving Chafee the control of both concerns.

The construction of this contract is one of the important points in this suit.

Now if the Quidnick Company were to furnish stock to the A. & W. Sprague Manufacturing Company and pay the latter a fixed price for manufacturing, then no debt could arise from the A. & W. Sprague Manufacturing Company to the Quidnick Company, except for damages for negligence or non-performance.

Or, secondly, if the Quidnick Company, willing to take all the risk of loss upon themselves in order to befriend the A. & W. Sprague Manufacturing Company, bought the stock and sent it to the latter to be manufactured, the goods to be sold, and after paying for stock, &c., the balance, if any, to go to the latter, then, if this was all the contract, no debt could arise from the latter.

But, thirdly, if the A. & W. Sprague Manufacturing Company, being out of funds, induced the Quidnick Company to assist them by furnishing stock, &c., the A. & W. Sprague Manufacturing Company to pay for the stock out of the sale of the goods and the Quidnick Company knowing that if the A. & W. Sprague Manufacturing Company did not do it, the trust estate would be liable for it, then if the goods did not sell for enough to pay advances, the latter would fall in debt to the former.

And this I think was the contract in this case. The consignment in the name of the Quidnick Company was merely for security.

Now if a contract is plain in its terms, the parties must be bound by it, but if it is ambiguous or not plain upon any particular point, then we have a right to consider, first, the state of things at the time, and the circumstances surrounding the parties; and second, the construction put upon it by the parties themselves in carrying it into effect, in order to get at what the parties really meant.

The Quidnick Company was solvent and the A. & W. Sprague Manufacturing Company embarrassed. These corporations were largely, but not entirely, composed of the same persons. So far as William Sprague and Amasa Sprague themselves were concerned, it would in the end make no odds to them what the contract was, but there were other stockholders. In ordinary cases, two corporations may enter into a trade, each expecting a benefit, and each running a risk; but why should the Quidnick Company in this contract take the whole risk; if anything was made the other party to have it, and if the goods sold for less than cost of stock and expenses the Quidnick Company to lose; the Quidnick Company not to make anything in any event.

On the other hand, if the Quidnick Company was to be paid for its advances by the A. & W. Sprague Manufacturing Company, and in any event by the trustee out of the trust property, then it was a reasonable contract for them to make.

In the next place, we have a right to consider the mode in which the parties themselves treated the contract and the construction they put upon it. Very able counsel have argued this case, and they not only have not urged, but have not even suggested in argument, the point upon which the majority of the court decides that there can be no indebtedness under this contract, but have argued it upon the construction I have put upon it.

Now if the books, when examined, show, as the respondents say they will, that there is no indebtedness, then this point becomes of no consequence; but if there is, and the parties acted on this construction, these considerations, with the others above mentioned, would be almost conclusive as to what the parties intended.

The complainants allege that there is an indebtedness of more than two million of dollars, and the respondents do not deny any indebtedness, but admit that the books show an apparent indebtedness of about one million of dollars, and say that the goods, &c., in the hands of the Quidnick Company, if sold at a fair rate without sacrifice, will produce a sum sufficient to cover this apparent deficiency.

So that the examination of the accounts is necessary to ascertain whether there is any indebtedness at all; and whether if there is any the mode of keeping the accounts has any bearing on the construction of the contract.

The complainants allege that so much of this indebtedness as arose under the contract was incurred for the carrying on or preservation and benefit of the mortgage trust, and for the benefit of and approved by the creditors. They further allege that said Chafee used the earnings of the Quidnick Company from this contract, and their funds accruing from other sources, to pay the creditors holding the mortgage notes, and to preserve and carry on the business of his assignors for the sole benefit of the creditors and to the loss of the Quidnick Company, and they claim a lien on the trust estate therefor.

As a further defence the respondents deny that, by virtue of any relation whatever, the Quidnick Company has any lien for advances; but contend that the contract of the Quidnick Company was only with the A. & W. Sprague Manufacturing Company, that their only claim is against them and as simple contract creditors of the latter.

This is to suppose that the Quidnick Company were fools enough to make large advances without security to a possibly insolvent corporation, whose whole property had been assigned for the benefit of its creditors, and if the same persons were, as it seems was the case, managers of both corporations, then they were rogues also. For persons holding a controlling interest in one corporation to contract with another, of which they are sole owners, to the advantage of the latter and the disadvantage of the former, would be a fraud upon the former. We cannot without evidence believe any such fraud was intended; but, on the contrary, it is evident from both bill and answer that the contract was

at the time deemed by the trustee and creditors a great benefit to the trust estate, in fact the most feasible and almost the only mode of carrying on the business and saving the creditors from great loss, executed, as the answer admits, with the consent of the creditors, and that therefore, while the name of the A. & W. Sprague Manufacturing Company was used, it was in reality made by Chafee and the creditors for their own benefit, and the A. & W. Sprague Manufacturing Company was only their agent in carrying it out. And Chafee, having control of both corporations, might put his own construction on the contract, and there was no one to question it.

If then there is an indebtedness from the trust estate, either from the contract as made or construed, or from the use of the Quidnick funds for the benefit of the trust estate, I think it must be considered as a part of the expenses incurred for the benefit of the trust and entitled to priority in payment.

In considering the present case we all leave out of consideration the ownership of the stock of the Quidnick Company. No question relating to that arises upon the papers in this case. It must be decided upon the papers as presented.

The complainants also allege that Chafee has used trust funds to buy up a judgment of the Bank of Commerce. If so, it must be held in equity to belong to the trust estate. A trustee cannot be permitted to speculate in the trust estate, nor for his own benefit to buy up debts against it either directly or indirectly through others. He can only in his own accounts be allowed what he has paid for them. So that such purchases may operate for the benefit of the creditors, and in some cases for the benefit of the assignors. So if he has bought stock or other property of either corporation. So if he has used Quidnick funds to buy up debts of the A. & W. Sprague Manufacturing Company, the former might be entitled to a lien or to a subrogation according to the equity of the case.

It is also alleged that a large manufacturing property has been sold under the direction of a committee of the creditors, at much less than its fair value, to a firm, one of whose members was at the time " an active and influential member " of the creditors' committee. The answer avers that neither the committee nor

Chafee knew that the firm were to be bidders. This denial is not as full as it should be.

The right of creditors to bid and buy, and for several to associate for that purpose, cannot be denied. But if they are also managers of the trust, the doctrines of equity in regard to trusts and trustees apply to the case, and it is the duty of the court to take care that their power is not exercised for their own benefit to the injury of smaller or other creditors.

The bill prays for an account and declaration of lien, and that the Bank of Commerce judgment be decreed to be a part of the trust estate, and that the respondents be enjoined from selling the trust estate except under the direction of the court.

We all agree that no sale should be made except under direction of the court.

This would enable the court to see that all interests are protected, to prevent the trust property from being thrown upon the market in such amounts as to necessitate a sacrifice ; to reserve from the sale or from the proceeds of sales enough to satisfy any liens that may be ascertained ; to withhold from present sale any portion of the estate the title to which is so clouded as that it would not sell for a fair value, until the difficulties are removed ; to prevent secret bidding ; or to provide for a sale by a master of the court, all which may be done upon proper proceedings to be advised by counsel and approved by the court. And in the mean time an account might be taken between the Quidnick Company and the A. & W. Sprague Manufacturing Company and the trustee.

October 29, 1881, forms of decrees were submitted by both complainant and respondents and counsel were heard upon them.

November 5, 1881, the court ordered the following decree to be entered :

*This cause came on to be heard before the full court, and was argued by counsel for the respective parties, and thereupon, upon consideration thereof, it is ordered, adjudged, and decreed :*

*First, That the A. & W. Sprague Manufacturing Company is not indebted to the Quidnick Company under the contract dated December 18, 1873, in the pleadings referred to.*

*Second, That the complainant is entitled to an account and*

*repayment of all sums which said defendant Chafee, by virtue of his position as treasurer of said Quidnick Company, has used of the moneys of or belonging to said Quidnick Company, for the payment of creditors holding the mortgage notes of said A. & W. Sprague Manufacturing Company, secured under the trust mortgage from the A. & W. Sprague Manufacturing Company to said Chafee, as trustee in the pleadings mentioned, or for the benefit of his trust estate under said mortgage, for purposes not within or under said contract of December 18, 1873; and it is referred to Samuel W. Peckham, Esq., as master, to take and state the accounts between said parties in respect thereof.*

*Third, It appearing that said property cannot be held to await such account, except at great and ruinous expense, said Chafee is hereby directed to proceed and advertise and sell the same, and deposit the net proceeds of each and every sale he may make in the Rhode Island Hospital Trust Company, in Providence, upon its participation account, in his name as trustee, not to be withdrawn except by order of this court, or some justice thereof, and either party may from time to time apply to the court for any directions to said trustee in relation to such sales.*

Upon this matter of a decree, POTTER, J., dissented from the action of the majority of the court as follows :

*November 5,* 1881, POTTER, J., dissenting. I do not think the court ought to make an order for the sale of the property so long as the title to it is in dispute.

The decree for sale will bind no one who is not a party to the suit in which it is made, and it may therefore be argued that no harm can be done.

In ordinary cases no mischief may be done. But here is an immense estate to be sold for the benefit of creditors, and if creditors appear and are represented in the suit, it by no means follows that the large creditors will look out for the interests of the smaller creditors as well as they do for their own.

And it is a very common notion too, that when a sale is made under order of court, the purchasers are sure of a good title. While the lawyers know that this is not so, and while we are apparently selling only land, mills, stocks, &c., we may in fact

be selling only the privilege of having a lawsuit, and thus may aid in misleading purchasers and promoting litigation.

A decree in the present case will not deprive any parties of their legal rights, but it will not bind all persons who have an interest in the property.  These are two grounds upon which the court of their own motion will generally insist upon making other persons parties, or will refuse to go on with the cause until they are made parties.

And the court ought to protect not only those who are bound by their decree, but also, as far as possible, those who may act honestly upon the faith of their decree.

And these considerations bring up a very important question, how far is the court justified in looking beyond the papers which · the parties have put into the case and the questions they have chosen to make.  Ordinarily we are bound to decide a case upon the papers and facts as the parties present them.  But if we are so confined in cases like the present, it is very evident that parties might collude and obtain a decree by which the interests of others might, even if not bound, be seriously prejudiced.

And even if parties do not collude, they may have an interest of the same nature in the result.  Now we know, not from hearsay nor loose declarations, nor from statements of counsel in argument, which might be inaccurate, but from our own records, that the title to all, or nearly all, of the property now sought to be sold, is in dispute.

April 28, 1879, Winthrop De Wolf, receiver of the Franklin Savings Bank, filed a bill in chancery, Docket No. 1,675, in the office of the clerk of this court, in which he seeks to set aside not only the trust mortgage of November 1, 1873, but the assignments executed on or about April 6, 1874, which latter purport to assign the whole estate of the assignors in trust; *first*, to pay the mortgage creditors, and *second* to pay their creditors generally.

That bill alleges that on the 28th of October, 1873, said bank was insolvent; that commissioners were appointed by the governor, who examined the bank, and the result was that the bank and its officers were, August 11, 1874, perpetually enjoined, &c., and a receiver appointed.  On November 10, 1874, he commenced

a suit against the A. & W. Sprague Manufacturing Company
and others, and on November 30, 1878, recovered judgment for
$826,912.78, on which execution was issued March 15, 1879, which
was levied upon more or less of the property now sought to be
sold, and said execution now remains unsatisfied.

And the bill further alleges, probably in order to meet an
anticipated plea, that on April 14, A. D. 1874, before the injunc-
tion, certain trustees of said bank authorized the standing com-
mittee to exchange the Sprague debts for the trust mortgage notes
in a certain manner, and if they could not succeed in that, then
to make the exchange as in their discretion they judged best;
and on April 15 the standing committee authorized the treasurer
to accept the mortgage notes as collateral, the bank to retain the
original paper; and this arrangement was carried into effect,
and an indorsement thereof made upon the notes, and time given
as provided in said mortgage notes. But the bill alleges that this
agreement was without any consideration and void.

A form of the mortgage note is attached to the bill, specifying
that it is payable in three years, and issued as collateral, &c.

The bill claims that the mortgage trust and the deeds of April 6
are fraudulent and void as against creditors, and that the agree-
ment of the Bank Committee with said Chafee to accept said
mortgage notes was without authority and void, and prays for
certain relief.

To this bill the respondents, June 6, 1879, filed a demurrer,
and with other reasons for demurring claim that the bank became
a party to the trust deed by accepting the mortgage notes, and is
estopped thereby from questioning its validity.

The complainants should have set this down for hearing, Rules
in Equity, No. 39; but if the complainants did not the respondents
might have done so, 1 Daniel Chanc. Prac. 621; Consolidated Or-
ders in Chancery of 1860, Order 14, § 11, page 53. They might
now move to dismiss the bill for want of prosecution; but that
would not remove the cloud from the title, but would merely lead
to another suit and to further delay in getting a binding decision.
For over two years the hearing on that bill has not been pressed
on either side. But until it is out of the way, every purchaser at
any sale this court may order will take with notice of that claim.

November 19, 1881, Zechariah Chafee, trustee and respondent in this case, presented to the court, Potter, Stiness, and Tillinghast, JJ., his petition, stating that by the decree of November 5, 1881, he was directed to sell the estate in his hands as trustee; that a part of this estate was the Baltic Mill property, in the State of Connecticut; that the mill had been lying idle since the termination of the contract between the Quidnick Company and the A. & W. Sprague Manufacturing Company above given; was depreciating in value, and was subject to the cost of insurance, taxes, and outlay for watchmen; that he had an opportunity to lease the mill estate under a lease annexed to the petition, and that the property was under attachment in litigation before the courts of the State of Connecticut.

The lease submitted provided that the lessee should at once occupy the premises, hold free of rent till January 1, 1882, and should have the premises for one year from January 1, 1882, at a weekly rent of $500, with the option of two years more on the same terms, the lessee to surrender at any time during these last two years on sixty days' notice in writing that the trustee, after clearing off liens and clouds on the estate, desired to sell in the performance of his trusts; the lessee, at the expiration of said three years, to have the option of renewal, at the highest price then offered, if the trustee wished again to lease; the lessor to pay insurance, taxes, permanent repairs, and repairs on dam, raceways, main shafting, main pulleys, walls and roofs, and an abatement of rent to be made in case of damage by fire or unavoidable casualty.

December 3, 1881, the court ordered "*that said Chafee, trustee, be, and is hereby authorized to lease said Baltic Mill estate in the manner proposed by and under the terms of said lease; and the clerk of this court is hereby ordered to certify the draft of said lease, submitted as a part of the said petition, as the proper form of lease and as approved by this court.*"

From this order POTTER, J., dissented in the following opinion:
*December* 3, 1881.   POTTER, J., dissenting.   This bill in this case was filed by the Quidnick Company against Z. Chafee, trustee,

Kimball, Robinson, and Jackson, trustees, the A. & W. Sprague Manufacturing Company, A. & W. Sprague, Fanny and Mary Sprague, and George Hutchins, for the creditors of the A. & W. Sprague Manufacturing Company. It states the assignment or trust mortgage executed by the Spragues, the contract made between the Quidnick Company and the A. & W. Sprague Manufacturing Company, alleges that under that contract and otherwise the latter is indebted to the former, and claims, among other prayers, a priority by lien on the trust estate for the payment of their said claim, and that the trustee be enjoined from selling the mortgaged property except under the direction of the court.

The answer contains certain admissions, averments, and denials, but nothing material to the present question.

Chafee now files a petition, alleging that by a decree made in this suit November 5, 1881, he was directed to proceed and sell the trust property; that the Baltic Mill, owned by the Quidnick Company, cannot well be sold on account of attachments; that it is now lying idle and he cannot run it; and praying that he may be authorized to lease it for positively one year, and conditionally, if not sold, for two years, if he cannot sell under his trust.

This petition is made by one of the respondents, Chafee. The justification for its being made in this suit can only be that the complainants had prayed that the property be not sold except under the direction of the court. A temporary injunction had been granted, but had expired, and the decree of November 5 amounted to a permission to proceed and sell. No direction was needed after the injunction had expired. His duty was prescribed by the terms of his trust. The answer contains nothing in the shape of a cross-bill. But waiving all questions of whether the petition comes properly within the terms of the prayer of the bill, there are other considerations which seem to me decisive of the case.

The property is mostly real estate, and situated, not in this State, but in Connecticut.

So far as personal estate is concerned, we may direct an assignee or receiver, appointed by this court, to bring within this State all personal property lying without this State that he can control. But even this is subject to this condition, that the courts of the foreign State will protect the claims of its own citizens

against the owner of the property, and will not suffer the property to be withdrawn from its jurisdiction, if necessary for that purpose ; and it is entirely a matter of comity and discretion with the foreign court whether they will aid a receiver or assignee from another State to obtain possession of such property if disputed.

But in regard to real estate situated in another State, the case is still stronger. We may direct him to do an act in regard to property abroad, and to a certain extent the order might protect him as far as concerns our citizens, parties to the suit in which the order is made. But, as a court, we can give him no power whatever over land in Connecticut. Whatever power he has over the estate he derives from the terms of his trust deed and not from us ; and we cannot even make any decision upon its validity or its construction which would bind the courts of Connecticut. Whether the deed gives him a power to lease must be decided by the courts of Connecticut. We might protect the assignee as against citizens of this State, but we have no power to protect the purchasers or lessees. They take their title subject to the laws and decisions of the courts of Connecticut.

And I cannot see any good reason for not making an absolute sale of the Connecticut property, which does not with greater force apply to the Rhode Island property. It is alleged that the Connecticut mill is subject to attachments and a lien. The Rhode Island property was subject to the lien of the Quidnick Company and to the judgment and execution of De Wolf, receiver of the Savings Bank. So far as the Quidnick lien is concerned, we can protect the purchasers against that by decreeing a lien on the fund. But so far as the Savings Bank judgment is concerned, that we cannot now protect purchasers against. That suit must be decided before any one is sure of a title. And as to the stock, we know from what appeared upon the hearing, the three cases having by consent of parties been heard together before us, that the facts upon which the trustee's right to sell a portion of it depends are denied, and the parties have never been heard upon them.

November 19, 1881, the respondents in this case and in the next

following one, filed their petition, stating "that said complainant Quidnick Company has now pending before this honorable court its two suits at law, numbered 1,851 and 1,853, and has also pending in the Supreme Judicial Court in and for the county of Kennebec, in the State of Maine, its suit at law ; that said suits at law are against the same defendants, or some of them, as those in the above entitled causes, and for the same causes of action as are the grounds of the above entitled causes, as by the declarations in said suits at law 1,851 and 1,853, on file in this court, will fully appear, and as by the copy of the declaration in said suit in Maine will also fully appear, to all which declarations your petitioners crave leave to refer as parts of this petition.

"That said Quidnick Company has, at this present term of this court, gone to hearing in the above entitled causes in equity, and has by so doing elected to pursue its equitable remedies against these defendants rather than its remedies at law.

"Wherefore your petitioners pray that said Quidnick Company may, by decree of this honorable court, be declared to have elected to pursue its equitable remedies as aforesaid; and may, by said decree, be ordered forthwith to discharge the attachments made in said suits at law, or in any of them, and may, by said decree, be perpetually enjoined from further prosecuting its said suits at law in this court and in said Supreme Judicial Court of the State of Maine."

*December* 5, 1881. TILLINGHAST, J. The defendants in the above entitled causes,[1] which have already been heard and decided by this court, now call up and urge a motion which was filed in each of said causes on the 23d day of September, 1881, and prior to the hearing thereof, which motion is that the court will order the complainant to elect whether it will proceed with its bills of complaint in equity, or with its suits at law, which suits, it is claimed by defendants, are based upon the same causes of action as are said bills in equity. The defendants also now move the court to declare that the complainant, having gone to a hearing in said causes in equity, has thereby elected to pursue its equitable remedies against the defendants, rather than its remedies at law.

---

[1] *i. e.* This case and the one next following.

The attention of the court was called to the former motion, before the commencement of the hearing upon the subject matter of said bills in equity, and it was then asked to order the complainant to elect ; but the court did not see the necessity, with the light which it then had, of deciding the question of the inconsistency of the cases, or of compelling the parties to elect which way they would proceed, and suggested that the first question to be determined was the question of debt, in order that the court might be enabled to decide whether any lien existed, as claimed in the bills. The position of the court upon this matter was distinctly stated at the time by the presiding justice, and we see no occasion for any misunderstanding at the bar concerning it.

It appears by the record that on the 21st day of July, 1881, the Quidnick Company sued out of this court an original writ in *assumpsit*, returnable on the first Monday of October, A. D. 1881, against said A. & W. Sprague Manufacturing Company and Zechariah Chafee, trustee and assignee of said A. & W. Sprague Manufacturing Company, laying the *ad damnum* in said writ at $2,000,-000, and procured thereunder the attachment of a large portion of the property and estate in the State of Rhode Island, in the hands of said Chafee by virtue of his trusts under the trust mortgage deed of November 1, 1873.

It also appears that on the 25th day of July, 1881, said Quidnick Company sued out of the Supreme Judicial Court of the State of Maine a writ returnable to said court then next to be holden at Augusta, within and for the county of Kennebec, on the third Tuesday of October, A. D. 1881, laying the *ad damnum* thereof at $500,000, against the said A. & W. Sprague Manufacturing Company and Zechariah Chafee, trustee and assignee of said A. & W. Sprague Manufacturing Company, and procured under said writ the attachment of a large portion of the property and estate in said State of Maine, in the hands of said Chafee under his trusts as aforesaid.

Also, that on the 12th day of September, 1881, said Quidnick Company sued out of this court an original writ of *assumpsit*, returnable on the first Monday in October, A. D. 1881, laying the *ad damnum* thereof at $1,000,000, against said A. & W. Sprague Manufacturing Company, one of the defendants in the above entitled causes.

On the 4th day of August, 1881, the same plaintiff filed in this court two bills of complaint in equity, the same being numbered 1,927 and 1,928 respectively, on the clerk's docket. By the former bill the complainant seeks to establish a lien upon the property attached in said suits and on all other property in the hands of said Chafee, trustee and assignee as aforesaid, for the security of an alleged claim of about $2,000,000, in favor of said complainant, against said A. & W. Sprague Manufacturing Company and said Chafee, as trustee and assignee. By the latter bill the complainant seeks to establish a lien upon the shares of corporate stock of said Quidnick Company, now held by said Chafee, trustee, &c., by way of pledge and collateral security to his said trusts, to secure an alleged indebtedness in favor of the complainant against said A. & W. Sprague Manufacturing Company of about $2,000,000.

The complainant does not deny that the bills in equity and the suits at law are based upon the same causes of action, but alleges that its bills in equity are in the nature of bills of discovery, and are auxiliary to and in aid of its suits at law; and it therefore claims the right to pursue both remedies simultaneously. No such claim as this, however, appears in either of said bills of complaint; and said suits at law, although two of them were commenced prior to the filing of said bills in equity, are nowhere referred to therein; and the only discovery prayed for in said bills is the ordinary prayer for an account between the parties.

The complainant also claims the right of trial by jury. But under the practice of this court it is well known that trial by jury is not limited to actions at law, but may be had as well upon all questions of fact arising out of suits in equity whenever either party demands the same.

There can be no doubt that the court has jurisdiction to interfere in a case of this nature and compel an election of remedies; or to declare that the complainant has, in fact, by proceeding with its bills in equity, elected, as to its remedies, and to restrain it from further proceeding on the law side of the court, to recover for the same cause of action; and the only question for the court to decide is, whether this is a proper case for the exercise of this power.

Says Lord Manners, in *Mocher* v. *Reed*, 1 Ball & B. 318, 320 : " After the plaintiff has obtained a decree to account, he is not at liberty to dismiss the bill ; having got the relief he prayed, his election is made, and he cannot afterwards proceed at law; besides, how utterly inconsistent with the ends of justice it would be to permit him to proceed in this court and at law at the same time for the same demand ; for the jury may find a verdict one way, and the Master make a report a different way, which would occasion such a clashing of jurisdiction as never could be endured."

In the case of *Conover* v. *Conover*, 1 N. J. Eq. 403, 409, the learned Chancellor says : " The practice is, where the party sues both at law and in equity for the same thing, he will be put to his election in which court he will proceed. . . . In this case there has been no order putting the party to his election, nor any application for such order, so far as I am informed. The proceedings in this respect have not been altogether formal, but an election has been made in fact. No steps have been taken in the suit at law. Testimony has been taken on both sides in this court relative to the very claim for which the action was brought, and the suit has proceeded here without objection. . . . They will be considered here as having made their election, and must abide the result. Any further proceedings at law will be stayed by injunction."

See also, to the same effect, *Wedderburn* v. *Wedderburn*, 2 Beav. 208, cited at the bar, and *Wilson* v. *Weatherherd*, 2 Merivale, 406. Furthermore this court has decided that the law in this State is in practical harmony with the cases cited, in the case of *Pawtucket Institution for Savings* v. *Almy*, not reported, where an election was ordered. In brief, the rule is, as well stated by the Master of the Rolls in *Wedderburn* v. *Wedderburn*, "that there is not to be a double investigation of the same matter upon which the court is to adjudicate."

As to the authority of the court to restrain a citizen from thus proceeding for the purpose named in a foreign court, the law is well settled that such authority exists.

Says Mr. Justice Story, in his Commentaries on Equity Jurisprudence, § 899 : "Although the courts of one country have no

authority to stay proceedings in the courts of another, they have an undoubted authority to control all persons and things within their territorial limits. When, therefore, both parties to a suit in a foreign country are resident within the territorial limits of another country, the courts of equity in the latter may act *in personam* upon those parties, and direct them by injunction to proceed no further in such suit."

And in Daniel's Chancery Practice, 5 Amer. ed. p. 815, cited at the bar, it is laid down that " the principle of election has also been applied where there was one suit in this country and another for the same matter in a foreign court of competent jurisdiction."

See also, to the same effect, *Dehon et al.* v. *Foster et als.* 4 Allen, 545; *Snook et al.* v. *Snetzer*, 25 Ohio St. 516; and *Pieters* v. *Thompson*, Cooper, *temp.* Eldon, 294.

Now, it is alleged on the one side and not denied on the other, that two of said suits at law are brought to recover debts claimed to have accrued to the complainant under the stocking contract, so called, of December 18, 1873. But this court has already decided that no debt could arise in favor of the complainant under and pursuant to said contract. Now, if these suits at law were allowed to proceed, the very novel question in substance for the jury to determine in the trial thereof, if it were competent to submit such a question to the jury, would be whether the court had erred in a question of law; and if they should determine that it had so erred, to practically reverse its decision by rendering a verdict for the plaintiff for the amount claimed under said contract. Or, to state the matter briefly, the complainant claims that a debt exists in its favor, under said contract, against the A. & W. Sprague Manufacturing Company, and has commenced a suit at law to recover the same. The court has construed said contract in another proceeding, between the same parties, and decided that no debt can exist thereunder in favor of the complainant. This being so, we can see no occasion for, or propriety in, a jury trial.

The other suit is brought to recover upon the " old debt," as it is termed, which existed prior to the execution of the trust mortgage deed. But this debt, as the court has decided, was cancelled or merged by the acceptance on the part of the plaintiff of the extension mortgage notes, which notes constituted a new and fresh

indebtedness in place of the old ; so that under the decision of the court, the cause of action fails in this as well as in the previously mentioned cases.

There is really nothing, therefore, as the cases stand, to go to a jury, even were the complainant allowed to pursue its remedies on the law side of the court.

As to the claim made at the hearing that the last mentioned suit was brought, or might be used, to recover upon the extension mortgage notes given by the A. & W. Sprague Manufacturing Company under and pursuant to the trust mortgage deed, we can only say that no such claim appears in said suits or in either of them, no notes being declared on or mentioned therein. Of course there can be no question of the complainant's right to maintain its suit at law upon those notes.

Furthermore it seems to the court that the complainant's remedy in equity is adequate and full. It has the assurance of a decree of this court, already passed, that the entire proceeds of the sale of the trust estate shall be held to secure and pay any indebtedness which may be found to exist in its favor against the defendants. It could have no more than the whole, if if were allowed to proceed in both ways at the same time. It would be simply carrying on two independent proceedings ·to accomplish the same result, neither being connected with or affording any aid to the other.

Upon a careful consideration of this case, the majority of the court can see no occasion for allowing the complainant to pursue its remedies for the same cause of action both on the law and equity side of the court ; and having already pursued its equitable remedies to a final decree, we feel bound to declare that it has thus made an election, in fact, and should be bound by the results. We, therefore, order the suits at law to be discontinued, and the attachments made thereunder dissolved.

STINESS, J., concurred.

POTTER, J., dissenting. This is a motion to declare that the complainants have elected, or to compel them now to elect, between their suits in equity and their suits at law.

It would seem from the bills in equity of the Quidnick Com-

pany, Nos. 1,927 and 1,928,[1] and from the statements as to the suits at law, made by the counsel for Chafee at the hearing before this court November 26, 1881, that the Quidnick Company had two claims against Chafee and the A. & W. Sprague Manufacturing Company, namely, a claim for about $216,000, due them before the failure of the latter concern, and also a claim accruing after the failure, under a certain contract made at the time of the failure, and for other advances.

The Quidnick Company, in their bill No. 1,928, claimed a lien upon the stock in the Quidnick corporation owned by the Spragues for a debt under the contract, and it is doubtful whether for anything else. This bill has been dismissed.

As the three cases [2] were argued together, there was a great deal of confusion, and it requires some care to distinguish the arguments which apply to the different suits and those which apply to neither. And it is true that the majority of the court, in their opinion delivered October 22,[3] considered that as the matter had been argued by counsel, as if it had been claimed in the bill, they had a right to decide it, and do say that this debt of $216,000 was paid by accepting the trust mortgage notes. But it is to be noticed that the decree entered November 5,[4] while it decides all the other points, does not touch this question, nor did either of the forms of decree proposed by the very learned counsel include it.

I do not mean to say that the court were wrong in holding as they did, but if the parties had intended, or the other members of the court supposed that the parties intended, to submit this question to the court, they should have been required by the court to amend their bill to plainly include it, or, at any rate, to have so agreed in writing. Otherwise the court should have refused to entertain it.

But it seems to me that if there were no other reason against ordering the suits at law discontinued, it is a sufficient reason for not making the order now that a motion is pending for rehearing both suits in equity. The complainants are now secured by at-

---

[1] *i. e.* This case and the one next following.

[2] *i. e.* This case and the two next following.

[3] In the next following case.                    [4] *Ante,* p. 380.

tachment.   The court have ordered the property sold, and have given the complainants a lien on the purchase money for a portion of the lien claimed.   If, on a rehearing, the court should be of opinion that the complainants were entitled to a lien for their whole claim, including the old debt, then, in case their claims should amount to more than what might be left of the purchase money, the complainants would have lost their attachment and the remainder of their claim.   Whether it might so happen in the present case cannot be foreseen, but I think the principle is sound.

*Decree entered December 10, 1881.*   "*That said defendants are entitled to the relief prayed for in their said petitions, and that said complainant, by proceeding to hearing and decrees in said equity causes, must be deemed and held to have elected to pursue its remedies in equity; and that, therefore, said complainant be, and hereby is ordered forthwith to discontinue its actions at law in said petitions referred to, namely, its two actions, numbered respectively 1,851 and 1,853, upon the law docket of this court at its present term, and its action against said A. & W. Sprague Manufacturing Company and Zechariah Chafee, trustee and assignee, now pending in the Supreme Judicial Court in and for the county of Kennebec, in the State of Maine, and forthwith to dissolve its attachments in its said actions upon the estate and property of the defendants therein; and that said complainant, its officers, agents, and attorneys be, and hereby are perpetually enjoined from further prosecuting its said actions at law or either of them.*"

Pursuant to the decree of November 5, 1881, Chafee, trustee, advertised the trust estates for sale at public auction, certain of them to be sold December 8, 1881, at noon.   On the morning of that day certain depositors in the Franklin Institution for Savings presented to one of the judges of the court their petitions praying that the said institution, that the petitioners and such other depositors as should come in, might be made parties to this bill in equity, and that the sale by the trustee, Chafee, might be enjoined.   The Franklin Institution for Savings had been in the hands of a receiver since August 11, 1874.   The petitions alleged

that the Franklin Institution for Savings was a large creditor of the A. & W. Sprague Manufacturing Company, and became insolvent on the failure of the latter to meet its obligations; that negotiations were pending for the purchase in bulk of the whole trust estate in the hands of Chafee; that such a sale was for the interest of all parties interested and favored by the depositors of the Franklin Institution, as appeared from their vote at a meeting called to consider the proposals for sale spoken of, and that while these negotiations were carrying on, the auction sales by Chafee, trustee, should be forbidden.

On these petitions an order was made "*that the Franklin Savings Bank, Winthrop De Wolf, receiver, Daniel R. Ballou and Orin S. Spencer, for themselves and other depositors' in said bank who may choose to come in, be made parties to the bill of complaint,*" and that the said Chafee "*be, and is hereby enjoined from selling or disposing of said estates described in said bill and in said petition, or any part or parcel of the same for the space of ten days from this date.*"

These orders were entered December 8, 1881, and the respondent, Chafee, at once moved for a dissolution of the injunction against him.

*December* 15, 1881.   STINESS, J.   This case was heard by the court on bill and answer.   It appeared that the defendant Chafee, by virtue of his office as treasurer of the Quidnick Co., had used and applied its funds indiscriminately to the benefit of the estate held by him in trust, and the court decreed that the complainant was entitled to a lien on the trust estate, sufficient to secure the repayment of the funds so used, and ordered that the case be referred to a master to ascertain the amount.   As it did not appear that the complainants' funds had been expended upon any particular portion of the property, but mingled with the trust estate, we could not decree a lien on any specific parcel; and as it was shown that the trust estate could only be held as security for the account at a great and ruinous expense, we directed the trustee to proceed to advertise and sell it, as he was desirous and authorized to do by the terms of the trust mortgage under which he held it, and to deposit the proceeds subject to our further order; the decree also provided that either party might apply to the court

for directions as to the manner of sale, in order to secure a proper execution of the order.

Pursuant to this decree the trustee advertised certain parts of the property to be sold by public auction on the 8th day of December, A. D. 1881, and on subsequent days.

Among the creditors of the A. & W. Sprague Manufacturing Co., whose property is held in trust by Chafee for the benefit of its creditors, is the Franklin Institution for Savings, now in liquidation in the hands of a receiver appointed by this court. On the day above named, certain depositors in that bank, representing that they were interested in the suit, prayed to be admitted as parties to it, and also prayed for an injunction staying the sales advertised as aforesaid for the space of ten days, in order to allow time for an offer to purchase the entire estate of the trustee to be perfected and transmitted to him, with a view to the settlement of all pending litigation, and upon this petition the injunction prayed for was granted by the order of one of the justices of this court.

Persons not named either as complainants or respondents in a suit in equity may be admitted as parties, when it appears that they are proper parties to the proceeding or have such a direct interest therein that the court can recognize it and provide for it. This is a suit brought by the Quidnick Company to recover its own funds, which, it claims, have been unlawfully added to the property belonging to the creditors in the hands of their trustee. It does not seek to affect the rights or the property of the depositors in the Franklin Bank in the least, but only to recover its own. To accomplish this, however, a sale of the property is necessary and is ordered. While it is true that the amount the property shall sell for may affect the dividend they will ultimately receive on their deposits, yet it seems to us that this is too remote an interest to be considered by the court to admit them as proper parties to seek an injunction. As well might the creditor of an individual, whose property had been ordered to be sold to satisfy an equitable lien or a mortgage, claim the right to be made a party to the suit, and ask the sale to be enjoined until he could negotiate a settlement, because the result of the sale would affect the value of the debt which the defendant owed him. It cannot be pretended that interests can be recognized to this extent.

Inasmuch as the receiver of the bank has entered his appearance as a defendant, we do not consider the question whether the depositors, as such, would have a standing before the court. But assuming that the depositors are proper parties to the bill and entitled to ask for the injunction, still, as we construe the decree in this case, we do not think the injunction should have issued. The decree of the court, whose execution was stayed by the injunction, was a final decree, upon full hearing, and specifically provided that applications for directions as to the manner of sale should be made to the court.

This provision was intended simply for the control, if necessary, of the terms of sale, and not for the suspension of its execution by injunction ; it contemplated also an application to the court itself, and not to a single justice. We do not, therefore, think it was competent for one justice to suspend or modify it.

The decrees of a quorum of the court cannot be superseded or stayed by the order of a single judge. Therefore, as the injunction was irregular, and we were informed at the hearing that the commendable purpose for which it was granted cannot be attained, it must be dissolved. We have referred to the interest of the parties only to show that we do not deny a meritorious injunction simply upon technical grounds.

TILLINGHAST, J., concurred.

POTTER, J., dissenting in part. In order to understand the questions made here, a very short statement is necessary. The Quidnick Company filed a bill against Chafee, trustee, under the Sprague mortgage and assignment, claiming a lien upon the trust property for certain indebtedness, and that the property should not be sold except under the direction of the court. The case was heard before three of the judges, and on November 5 the following decree was entered :

" SUPREME COURT, October Term, 1881.

"*Quidnick Company* vs. *Z. Chafee et al.*   In equity, No. 1,927. This cause came on to be heard before the full court, and was argued by counsel for the respective parties, and thereupon, upon consideration thereof, it is ordered, adjudged, and decreed :

" *First*, That the A. & W. Sprague Manufacturing Company is

not indebted to the Quidnick Company under the contract dated December 18, 1873, in the pleadings referred to.

"*Second*, That the complainant is entitled to an account and repayment of all sums .which said defendant Chafee, by virtue· of his position as treasurer of said Quidnick Company, has used of the moneys of or belonging to said Quidnick Company for the payment of creditors holding the mortgage notes of said A. & W. Sprague Manufacturing Company, secured under the trust mortgage from the A. & W. Sprague Manufacturing Company to said Chafee, as trustee, in the pleadings mentioned, or for the benefit of his trust estate under said mortgage, for purposes not within· or under said contract of December 18, 1873, and it is referred to Samuel W. Peckham, Esq., as Master, to take and state the accounts between said parties in respect thereof.

"*Third*, It appearing that said property cannot be held to await such an account, except at great and ruinous expense, said Chafee is hereby directed to proceed and· advertise and sell the same, and deposit the net proceeds of each and every sale he may make in the Rhode Island Hospital Trust Company, in Providence, upon its participation account, in his name as trustee, not to be withdrawn except by order of this court, or some justice thereof, and either party may from time to time apply to the court for any directions to said trustee in relation to such sales."

The material parts of this decree at present are that Chafee was directed to proceed and advertise and sell the property, deposit the proceeds in banks, " and either party may from time to time apply to the court for any directions to said trustee in relation to such sales."

Under this decree, or rather under his trust deed, the trustee proceeded to advertise, &c.

By Pub. Laws R. I. cap. 563, § 9, of April 20, 1876, any person not a party to a bill, upon making it appear to the court "that he is interested in the subject matter of the suit, or proceedings," &c., &c., may be allowed to become a party, &c.

And by Pub. Laws R. I. cap. 291, § 1, of March 27, 1873, one judge of the court is made a quorum for all equity matters excepting demurrers and final decrees.

On the 8th of December, 1881, Messrs. Ballou and Spencer,

claiming to be depositors, and also to be a committee of, and agents for other depositors of the Franklin Savings Bank, and claiming that said bank was a creditor of the assignors who made the trust deeds, presented a petition to a judge in chambers stating these facts, and praying that they themselves, as depositors, and said bank and its receiver, be made parties to the suit.

Said savings bank was then under injunction and in the hands of a receiver appointed by this court under Gen. Stat. R. I. cap. 140, §§ 45, 47, by which the Supreme Court has the same power over receivers so appointed as is exercised by courts of equity in like cases.

Have the depositors, as such, a right to intervene and become parties to the suit, and a right to ask and have the receiver made a party?

In the case of ordinary corporations it is the general rule that the shareholders shall first apply to the corporate authorities to proceed themselves or to give the shareholders the right to use the corporate name. But in regard to this the practice of the English Chancery Courts has been very much modified. See *Foss* v. *Harbottle*, 2 Hare, 461, 491; *Wallworth* v. *Holt*, 4 Mylne & Craig, 19, 635, and note 5 in Amer. ed. And it must often be so from the necessity of the case. In cases where some of the corporate managers are concerned in the matters complained of, it would not only be useless to apply, but might give them a warning which would defeat the object sought.

And this is not a matter of substantive law, where the court cannot alter the rights of the parties. It is merely a matter of practice concerning the manner in which parties may get before the court, which, except where the State has expressly prescribed rules, or has impliedly recognized some particular practice, is within the control of the courts.

But this is not the case of an ordinary corporation, in which the only right of a shareholder is to a dividend. In a savings bank a depositor puts in a certain sum. He has a right to withdraw at any time, subject in some cases to the rules as to notice. Practically the bank is merely his agent for loaning his money, and in the present case there are still other reasons. There is now no corporation in active existence. Its whole property is in the hands

of a receiver, who is an officer of the law appointed by this court, and subject to its direction.

And under the broad-provisions of the new statute, it seemed to me the depositors have a right to be parties. True, the Quidnick Company, the complainant, seeks no relief against them, and a decree made in this suit would not affect the amount of their claim, but it may materially affect the amount of the funds out of which they may have a chance to be paid.

And it is reasonable to suppose that the new act was intended to remove many of the quibbling objections which we see by the reports were formerly made in such cases, and to prevent the necessity of bringing separate suits and increasing the expense of litigation.

And it seems to me not very difficult to imagine many cases where a creditor of a person, on whose property another person was attempting to establish a lien, might very properly be made a party in order to be enabled to dispute the validity or the amount of the lien ; and more especially where his own claim had gone to judgment, as in this case.

If any new parties come in, they must ordinarily come in as defendants. The plaintiffs cannot be obliged to admit any one to come in as co-plaintiff, and so have control of their side of the suit. But any person having an interest, even if the same as the plaintiffs, may be made defendant; and plaintiffs are often obliged to make a person defendant who has the same interest with themselves, merely because he will not join with them in the suit.

In form the order of December 8 was a direction to the trustee not to sell for ten days, appointing a day for hearing, and reserving the right to move for a dissolution of the order sooner. This reservation is usual but unnecessary, as the party would have the same right without it.

The majority of the court had made a decree authorizing the sale, but prescribing no time, place, or manner, and giving no directions whatever. If they had done so, no judge, whether having the power or not, would have undertaken to rescind it.

It is said in the opinion of the majority that the decree of November 5 was a final decree, and therefore could not be altered.

There was nothing final about it; it was in no sense a final decision, requiring two judges to make it valid.

If any authority was needed upon this point, it is only necessary to quote the highest, the Supreme Court of the United States. In the case of *Perkins* v. *Fourniquet*, 6 How. U. S. 206, a decree of a Circuit Court declaring that the complainant was entitled to certain property, and referring the cause to a master, was held to be an interlocutory, and not a final decree, for the reason that until the master's report came in and was disposed of, all such orders and decrees remained under the control of the court.

And when the case having been sent back to the Circuit Court, that court, on the hearing on the master's report, reconsidered and reversed its former interlocutory decision, and it was again brought before the United States Supreme Court; *Fourniquet* v. *Perkins*, 16 How. U. S. 82; that court sustained the last decision of the Circuit Court, saying that if the court below, upon further reflection or consideration, changed its opinion after passing the order, or found that it was in conflict with a decision of the Supreme Court, it was its duty to correct the error. And in both cases the opinion was delivered by Chief Justice Taney. It had been contended in that case that a motion for rehearing was necessary. See, also, *Cronin* v. *Watkins*, before Chancellor Cooper, 1 Tenn. Ch. 119; *Dormer* v. *Fortescue*, 2 Atkyns, 282, 284; and *Gibson* v. *Rees*, 50 Ill. 383.

Not only was the decree of November 5 not a final decree in any sense requiring two judges to make it, but it did not even purport to be final as to the sale, expressly reserving the right to any party to apply "to the court" for directions as to the sale.

It is said that the decree contemplated an application to the same judges that made it, and not to a single justice, and therefore one judge could not modify it. It may be that the judges intended to reserve to themselves the sole power to modify. If they had a right to do so, they should have said so. But they did reserve the power "to the court."

Now what is "the court" under our statutes, for it is that which must decide the question. And it would be difficult to make language plainer than the language used, and that is, that in equity cases one judge constitutes a court, and has all the pow-

ers of the court for all purposes except hearings on demurrers and final decrees.   And the decree of November 5 was neither.

And it is said that one judge cannot supersede or stay an order of two judges.   Doubtful at least, provided the order be an interlocutory one.   Under our present system it requires a great deal of care and consideration to prevent conflict.   Hitherto there has been no conflict.

I concur in the order dissolving the injunction for the reason last given in the opinion of the majority.

*Decree accordingly.*

After the decree of November 5, 1881, Chafee, the trustee, received several offers to purchase in bulk the trust estate in his hands.   One of these offers he was advised to accept by a committee purporting to represent a large majority of the creditors, whereupon Chafee submitted the offer to the court, for its advice and approval.   Notice of the pendency of the matter before the court was ordered and given, and after hearing the parties interested, the court gave the following opinions:

*March* 8, 1882.   STINESS, J.   Upon the hearing of the bill and answer in this suit, an order was made that the estate held by the trustee should be sold, and the proceeds held to satisfy the complainant's lien.   As the trustee was authorized by the deed under which he held the property to sell it at public or private sale, and upon terms in his discretion, we gave no directions about the sale, supposing that he had better opportunities than we had to know how to sell it most advantageously to the creditors.   In order, however, to guard against any possible impropriety of sale, we provided that either party might apply to the court for directions, and under this provision the trustee now applies for instructions upon proposals to purchase the entire estate at a fixed price.

The duty, as well as the desire of the court, is to see that the property is disposed of to the best advantages of the creditors for whom it is holden.   To this end, therefore, it must be sold as speedily as it can be, for all who have been before us agree that it is rapidly wasting in idleness.

All of the property located in this State, at least, can be sold

now. So far as we are advised, unless upon a small portion of the bank stock, no liens, clouds upon the title, or other obstructions to a sale remain. The lien decreed to the Quidnick Company in this case, being simply for a money claim, in case of sale, is to be upon the proceeds, instead of the property itself, and is therefore no hindrance to a proper disposition of it. Some of the property in other States is under attachment or other litigation in local suits, but that should not delay a sale of the debtors' interest in it, if the creditors desire it to be sold. To put off judicial sales until all questions have been litigated and adjudicated would be oppressive and ruinous to the creditors. It is a very common thing to sell on execution, all the right, title, and interest of a debtor, where there are adverse claims, and there is no reason why the same course should not be taken in this case. It certainly would be unjust to delay the settlement of this estate until the end of those suits, which we have been told will not be reached for many months, and may not be for several years hence. The creditors are entitled to the present value of the trust estate. A purchaser can make satisfactory allowance in his offer for the insecurity of that portion of his title, and can abandon the disputed property, compromise or contest the claim, as he sees fit, and do many things about it that a trustee could not do. If, therefore, the creditors prefer the present value of this property to its uncertain future value, they are entitled to an immediate sale.

How, then, should it be sold? Considering only the large amount and the great variety of the property, we should say without hesitation that it would be best to sell it in parcels; that there would be likely to be many persons who would want to buy certain pieces or kinds of property, while very few would be likely to seek, or be able to buy, so many widely different kinds, and of such large extent as are embraced in this trust. But as this estate belongs to the creditors, and they are entitled to its proceeds, they are also entitled to say in what way they would be best served in its disposition. Whatever mode we might think to be the best, if they want a different one, which is not illegal or improper, we think they should have their way.

In December last an offer was made to the trustee for the entire

estate at a fixed price, which he referred to a committee of the creditors. The creditors advised him to reject that proposition, but voted to accept another of the same tenor, made in the interest of such of the creditors as could, and should join in it. This the trustee accepted subject to the approval of the court, and presented his request for approval accompanied by the signatures of those holding a major part of the trust mortgage notes. At the same time a similar but larger offer was made by another party, accompanied by the petition of the assignee and debtors, and urged by the counsel for the complainant in this case. This was continued for three weeks, to give ample opportunity to the creditors and others to consider the matter, the court intimating that if no other or better offer was made, this one would be recommended. Unless we could be reasonably certain that the estate would bring more, if sold in some other way, we could not in justice to the creditors ignore these offers for a fixed sum, and direct the trustee to exercise his authority to sell regardless of them, for the property might not bring as much; but if, after suitable time for notice and deliberation, no better offer should be made to the trustee, we would then clearly have been justified in assuming that to be its fair value, and clearly not justified in jeopardizing the interests of the creditors by directing the trustee to reject a certainty for an uncertainty; while in case of a better offer, we should then know that other parties wanted to buy the property, and that the trustee may reasonably expect to realize from competition that which it would be idle to attempt if only one party was willing to purchase. This offer came before us with the approval of other creditors holding nearly a majority of the indebtedness. We, therefore, have the vote of a meeting of the creditors; the signatures of about three quarters, in amount, of the holders of the votes; the assent and approval of the trustee; a letter from the committee of the creditors to the trustee, and the request of the debtors, all favoring a sale of the property by bulk; and, after ample notice, no creditor objects to it.

Where all the parties in interest substantially agree as to the best course to pursue, we think we should follow it, especially as this course does no injustice to any one. It is easy to see that the creditors may consider that in a sale by bulk a possible loss from

lack of competition will be compensated by the speedy and definite ascertainment of the net value of the property; that the increased expense of sales by parcels may approximate, if not equal, the additional amount to be realized; that the average net result would not be much different from the amount offered for the whole, or that it is safer to accept a known sum than to run the risk of a general auction. Certainly these are cogent reasons for the plan.

For what sum then should it be sold?

The offer made by Mr. Lapham is $2,880,000. Within the time limited, still another offer is made, to bid the same amount as an upset price, at an auction sale of the estate.[1] We think this is a better offer than Mr. Lapham's, because under the latter, no more than the sum named could be realized, while under the former no less than that sum, and possibly more, will be bid. It is unnecessary to compare the details of the two offers, for as we have now ascertained that there is likely to be competition for the estate, we think it should be sold under such circumstances as to allow full and free competition.

Although the last offer is not so satisfactory in its form as those which have preceded it, yet from the well known character of the firm that makes it, we do not doubt its good faith or full performance.

We, therefore, advise the trustee to name an early time and convenient place to receive offers by open competition for all his right, title, and interest in the estate, and that he then and there execute a contract of sale with the party or parties, being satisfactorily responsible, whose offer, in accordance with the terms of sale, shall be the highest. These terms of sale should be such as to secure to the trustee the performance of the contract, and the terms of the contract such as to secure the creditors as speedy payments as possible, and, in case of deferred payments, ample security. As certain details of sale have been brought to our attention, we would suggest:

*a.* That none of the personal property, except, perhaps, that

---

[1] This offer was the one made by Wilbour, Jackson & Co., under date of March 3, 1882, and printed *infra*, p. 422.

necessary to the running of the mills, should pass out of the hands of the trustee until its full value has been paid, or that he should be authorized to sell it and apply the proceeds in reduction of the purchase money, over and above the first instalment.

*b.* That the trust notes should not be accepted as cash, in excess of dividends due upon them, under any distribution resulting from this sale, as this would be equivalent to giving the holder of such notes his payment in full upon them at once, while others would be required to wait, and their payment would be delayed in proportion to the amount of such notes received as cash.

*c.* That if any deed is delivered as an escrow, it should be delivered to the clerk of this court, to be by him deposited in the registry of the court.

*d.* That the contract should provide that failure on the part of the purchaser, for a specified time, to make any required payment, should forfeit the contract and all payments made thereunder, and that the purchaser, and all persons holding under him, shall be deemed to be tenants by sufferance only of said estate, or any part of it.   In other respects the terms contained in the offers before submitted seem to be proper.

The trustee may prepare terms of sale embodying the foregoing suggestions, with such others as he may deem proper, and submit them to the court for approval.

TILLINGHAST, J., concurring.   The main question now before the court is one which involves no question of law, but is purely a business proposition, namely, whether or not the offer to purchase the Sprague estate, submitted to the trustee by Messrs. Wilbour, Jackson & Co., March 3, 1882, is a better offer than that previously submitted by the Hon. Benedict Lapham.   I think it is, and for the following reasons : *First,* because it is an offer which is made in the form of a first bid at a competitive sale of the entire estate in bulk; an upset price as it is termed at auction sale, thereby opening the door, or rather leaving it open for further and better offers or bids, which, as it seems to me is a very important consideration.   *Second,* because the offer is to give the sum named, $2,880,000, *for such title to the property as the trustee can give,*

the purchaser taking all the risks as to the validity of the same, thereby absolutely and fully relieving the creditors from all further litigation in the premises, and insuring them this sum at all events; while the offer of Mr. Lapham, although of the same amount, is conditional as to title, and provides as follows : " The undersigned is to receive from said Chafee, in consideration of said payments, a full and perfect title of all the property as it stood in the hands of said Chafee on the 1st day of July last, . . . belonging to or in any way coming to him by virtue of said trust deed, and the several deeds of assignment made in April, 1874, to him of said property, and by virtue of a deed of trust to certain trustees from the National Bank of Commerce in New York, which he caused to be purchased from said bank, free from all incumbrances made or suffered by him, except the lease of the Baltic Mill, which shall not be deemed an incumbrance, this title to be conveyed by deeds or assurances of title sufficient in form and fact, to convey all such title, in the opinion of counsel learned in the law, to be mutually agreed upon," &c.

And *third,* because under this offer of Wilbour, Jackson & Co., the quick assets of the estate are not to be delivered to the purchaser at all, but are to be converted into cash by the trustee, the proceeds thereof to be by him applied towards the payment of the total amount bid, thereby incurring no possible risk in the disposition of such assets ; whereas by the offer of Mr. Lapham it is contemplated that the entire personal estate, amounting to upwards of $1,000,000 in value, shall be transferred and delivered upon the payment of the first instalment of $720,000. Of course I do not intend by this criticism to reflect in the least upon the entire good faith or financial ability of Mr. Lapham, for I consider them both quite beyond question, but am simply considering the offer as a business transaction between Mr. Lapham and the trustee, the latter acting for his *cestuis que trustent.*

These reasons, and particularly the first two, seem to me quite sufficient to warrant the court in advising the trustee that the offer last made is the best for the interest of the creditors, the parties first to be considered, of any which has yet been brought to our notice. Furthermore, a competitive sale of trust property when it must be sold, is in my judgment by far the fairest and least ob-

jectionable mode of disposing thereof, and courts should be slow to sanction a different plan except for special reasons.

I therefore concur in the opinion delivered by my brother, Judge Stiness.

POTTER, J., dissenting.   By a decree entered November 5, 1881, in this cause, the court directed Chafee, the trustee of the Sprague estate, " to proceed and advertise and sell the same, and deposit the net proceeds of each and every sale he may make in the R. I. Hospital Trust Company, in Providence, upon its participation account, in his name as trustee, not to be withdrawn except by order of this court, or some justice thereof, and either party may from time to time apply to the court for any directions to said trustee in relation to such sales."

The bill, and, of course, the decree referred to, covered all the property which was conveyed to the trustee by the joint assignment executed November, 1873, and by the separate assignments of Amasa and William Sprague executed in April, 1874.

The trustee accordingly advertised the property for sale in parcels, but on account of certain proceedings in court and subsequent offers of negotiation, the advertisements were withdrawn.   These negotiations related, as is well known, to the sale of the property in the mass instead of in parcels.

The sale and disposal of such an amount of property has embarrassed the trustee, and the court also, and one of the most important questions is whether it is most for the interest of the creditors that it should be disposed of in the mass or in parcels.

It is evident that if it is disposed of in parcels it would be in the power of the larger creditors, combining, perhaps, with persons outside, and by agreeing not to bid against each other, for the separate parcels, to obtain them at a very low price.   The very fact of their holding a large amount of the trust notes would enable them to overbid outside persons not in the combination. And the estates, or most of them, would be beyond the means of the smaller creditors, even if they did combine, of which there would not be much probability.

On the other hand it is evident that if the property is to be sold together, it can then only be sold to a combination of persons, unless purchasers are to be found without the State.   There

are but two or three families in this State who have the means to purchase and pay for it.

December 12, 1881, B. F. Butler, for himself and others, made an offer to the trustee, Chafee, which, after some negotiations was rejected.

December 21, 1881, a meeting of the creditors voted to recommend to the trustee to accept any offer of $2,600,000 for the whole property.

And January 23, 1882, Hopkins and associates, numbering 152, and representing, as it is claimed, $4,682,000, being more than half the amount of the debt, made an offer for the whole property of $2,600,000.

And January 25, 1882, the trustee petitioned the court for its advice and direction in the premises.

At the hearing on this petition before the court, February 11, 1882, Benedict Lapham, for himself and others, in open court made an offer in writing for the whole property of $2,880,000.

And the court, after hearing the parties, postponed the further consideration of the matter until March 4, saying that they would not " advise the acceptance of the offer made by Mr. Hopkins and others at present, as another, and, in our opinion, a better offer, and by a responsible party, has been made. . . . We will advise the acceptance of the offer made by Mr. B. Lapham, unless some further and better offer be made before that time."

Even if neither of these offers is accepted it may be well to compare them, as they suggest many things which ought to be considered in any sale of the estate.

Now on comparing these two offers we find that in certain portions, the language is the same.

Hopkins proposes to take from the trustee all his right and title to all the property as it stood in the hands of said Chafee on the first day of July last, deducting certain expenses, belonging to or in any way coming to him by virtue of the said trust deed, and the several deeds of assignment made in April, 1874, to him of said property, with the Bank of Commerce judgment, free from all incumbrances except the Baltic lease.

Lapham's offer is identical in words, except that he uses the phrase " a full and perfect title to the property as it stood on the

first of July." We must understand this to mean that he is to make as full and perfect title as he as trustee can make. He is not required to give a warranty, and the court could not require or authorize him to warrant.

The title by the Hopkins proposal is to be conveyed by deeds sufficient in form or fact to convey all such title in the opinion of counsel learned in the law, &c. The language of the Lapham proposal is the same.

The provisions as to time of payment, interest, and default are the same, except that Lapham is to pay $10,000 down when his offer is accepted. Both are to have the right to pay in excess of the instalments due, in cash. Lapham proposes to have the privilege of paying any excess in trust notes, which certainly cannot be allowed.

Both parties propose to have the right to sell portions of the property, the purchase money of such portions to go to the trustee in payment of the amounts due from said Hopkins or said Lapham.

The provisions as to certain property already sold are the same in both offers.

In what do the offers differ ?

The Hopkins proposal is that Chafee shall sell all of certain stocks, receive the proceeds, and deduct them from the $2,600,000. This provision is not in the Lapham proposal, but it should be inserted in any terms of sale, whether at private sale or at public auction. It does not affect the amount to be paid to the trustee for the property, but it does affect the security.

Lapham offers to pay $10,000 down as earnest money ; but the most important difference, and which, with certain modifications, must be decisive as between these two offers, is that Lapham offers $2,880,000, while Hopkins & Company offer only $2,600,000, being a difference of $280,000.

Hopkins offers to pay certain back interest to the Franklin Savings Bank, which Lapham does not. This, however, does not at all affect the general creditors.

There can, therefore, be no question as between these offers.

Now, if the whole body of creditors, small as well as large, could participate in the benefits or profits derived from the sale ;

in other words, if the property was conveyed to the whole body of creditors or to a corporation in which any creditor could invest his notes as stock, the price paid would not be so material. For if all the creditors join and form a corporation and purchase, then if they purchase for a sum less than the real value, or if the property rises in value afterwards, each creditor will participate in this increase of value by the increase in the salable value of his stock.

But it is very evident this cannot be. Even if the National Banks and the Savings Banks could go into such business, there are many other creditors who could not or would not.

But, December 21, 1881, at a meeting said to include a large number of creditors, and who are now represented by what is called the creditors' committee, it was voted, and, so far as appears, unanimously, to advise the assignee to accept $2,600,000 for the whole property, and subsequently Mr. Hopkins and others of the creditors offered that sum.

Now, the creditors represented at that meeting, and including their committee, must have thought that sum the fair value of the property at that time. Many of them are known to be shrewd, sensible business men, who know the value of property; and to say that they did not consider that sum the fair value is to accuse them of being designedly unfair towards the smaller creditors, who could not join in the purchase.

Now I do not believe that the creditors at that meeting intended any such thing. There is every reason to suppose that they thought that, considering the condition the property was in, and the great e◼ense necessary to start the business, the price they named was a fair one. And I see no reason to suppose it was not a fair price. As fair men they must have supposed it a fair price, not only for themselves but for the small creditors. And it is but just to the creditors' committee to say, I do not understand them as objecting now so much to the sum offered by Lapham, as to the conditions. And as to some of the conditions, we all agree with them.

What then enables others to make a larger offer for the property? It is well known that there are important suits pending, the decision of which may materially affect its value, and that

there are other disputed matters which may become the subject of litigation, and the Lapham company say that they have arranged all these disputed matters, and that they can therefore afford to pay a better price.

Some¹ of these contested matters have been brought to the attention of the court by the papers in the various suits and by the discussions upon them.

One of them, and a very important one, is the claim of Fanny Sprague and Mary Sprague.

December 2, 1873, they transferred their 1,400 shares of Quidnick stock on the books to Chafee, " by way of pledge and collateral security," to secure the performance of the conditions of the trust mortgage, and they subsequently executed a transfer of the right to redeem it to certain persons for the benefit of creditors, and this latter transfer it is claimed that William Sprague never signed.

If, as these ladies contend, this was, so far as concerns the mortgage creditors, only a pledge, then the pledge can only be sold at public auction after due notice for that purpose, or by bill in equity for sale.   And whenever the case arises, it is easy to foresee that the argument against an order of sale will be, that the pledge was merely collateral; that the assignee had in his hands property, at the value put upon it by the creditors themselves, more than double the mortgage notes conveyed to him by these pledgors and others; that by mismanagement that property has been wasted, and therefore the assignee has forfeited all claim to hold the pledge.

The latter assignments were for the payment of debts generally, and as, from the statements made to us, all claims against them except the trust notes and any judgments would be outlawed, it is difficult to see how they would affect the law or equity of the case.

I am only stating the facts as I understand them to be admitted or claimed.   If on trial the facts should turn out to be different, the effect, of course, would be different.   But there might be litigation, nevertheless.

I do not mean in saying this that there is anything before the court to impeach Mr. Chafee's honesty or conduct.   On the con-

trary, so far as now appears, he seems to have been in the midst of fires on all sides of him ; and probably not one man in ten thousand but would have in his place done acts, thought prudent at the time, but in the light of subsequent events shown to be blunders.

And if their claim to hold the stock is established, then another consequence follows : This court has already decreed, November 5, 1881, in this case, that the Quidnick Company is entitled to an account and repayment of all funds of that company which Chafee used to carry on the business of his trust. Whatever amount was found due, Fanny and Mary Sprague would be entitled to their proportion of it, either in money or in the increased value of the stock. And if a corporation on demand refuses to take proper measures to protect the rights of its stockholders, an injured minority can always appeal to a court of equity.

Again, if the Quidnick Company establishes a claim against the trust estate, it would require some portion of the trust estate to satisfy it. This, of course, would be so much lost to the creditors.

This is only one of several complications which may arise in the settlement of the trust ; and it is easy to see that the one we have mentioned would lead to great delay. And I have alluded to them as explaining the reason why the Lapham party, having settled them, can afford to give more than the creditors had before fixed as a fair value.

It is suggested by the creditors' committee, in a letter written by them February 22, 1882, that if the sale takes place by parcels, the trustee should ask the court for authority to deposit the proceeds in the Hospital Trust Company, and that the proceeds, instead of the property, be held as a fund to await the result of pending litigation.

This may be a matter for future hearing if necessary. Ordinarily, where a person, a creditor, for instance, has a claim for payment upon a particular fund, it is no injury to require that the fund be converted into money. But if the question arises whether a particular piece of property constitutes a part of the fund; to sell a man's property, and then, if he succeeds, turn the money over to him instead, is not, as I understand, according to the principles of equity.

Each offer now before us is recommended by portions of the creditors.  The claim on behalf of the Hopkins offer is that they represent more than one half of the amount of debts.  This is denied by other creditors, who say that if the name of the receiver of one of the savings banks is stricken out, they have not a majority, and a committee of depositors of the same bank have signed the recommendation of the Lapham offer.

It is to be noticed also that the committee of creditors, in their letter of February 22, 1882, do not undertake to say that the property is worth more than Lapham offers.  To have said so would have been rather inconsistent with the valuation they themselves had made of it a few months before.

The court has now to decide upon the last proposition made to us.  Notice had been given that the Lapham offer would be accepted unless, before March 4, 1882, a better offer for the property was made.

No offer at all has been made of any larger amount than the Lapham offer.

What has been done is this : Certain persons, March 3, 1882, send a letter to the trustee saying that if the court will put up the property at auction, they will bid the same amount Mr. Lapham has offered.  And this latter was marked *confidential*.  It was, of course, not intended to be made public.  It has not yet been communicated to the court by the trustee.  A copy of it, without the signature, was indeed read to the court on March 4, and the name of the firm was afterwards disclosed.

This new proposal also does not undertake to say that the property is worth more than $2,880,000, nor to guarantee a bid of any sum over that of any amount.

If the firm of Wilbour, Jackson & Co. had, within the time fixed, pledged themselves to bid at auction $100,000 or even $50,-000 over and above the Lapham offer, I should have thought it the duty of the court to try the experiment for the benefit of the creditors.  But they have not done it.

It seems to me, therefore, that the last offer, if it can be called an offer, is no better than the former ones, and that it may lead to considerable delay without any certainty of benefit, and that, therefore, it is for the interest of all the creditors that the Lapham

offer, with a few modifications, should be accepted. If he should not consent to the modifications, the assignee must of course look for further offers.

And it seems to me important to consider that these parties who, instead of making any additional offer, merely suggest that it would be better to try an auction, are, so far as we are informed, entirely outside parties. They are not creditors. And not a single creditor has appeared before the court to object to the acceptance of Lapham's offer if some of the conditions are modified. Quite a large portion of the creditors have recommended the acceptance of it unconditionally. The creditors' committee object only to some conditions, but not to the sum. They do indeed suggest an auction, in their letter to the trustee, if Lapham's offer should be rejected, as I understand them.

Unless something has happened since December 21, 1881, to increase the value of the property, or unless the creditors' committee think there is some chance of compromising the pending and threatened litigation, there is no probability that any creditor would bid even as much as the Lapham offer.

I think that instead of the decree simply providing for advising the assignee to accept any particular offer, without more, it should, in order to remove any ambiguity, specify as terms : that the deed should convey all the title of the property as it stood July 1, 1881, this is in both propositions as we understand them, and is probably intended to provide against the case of any transfer since made ; that the conveyance should be by deed of assurance of title sufficient in form, and in fact in the opinion of counsel learned in the law to convey all such title, this provision being the same in both offers ; that the deed should be deposited in the registry of the court in escrow ; that until complete payment the purchasers shall be deemed tenants at will, subject to the order of the court; and that no bank or other stocks should be transferred to the purchasers, except upon actual payment in cash of the amount of their value ; and to remove all doubt, these provisions should be inserted in a contract of some sort or in the deed, and that all risk of title to the property should be taken by the purchasers.

If Mr. Lapham consents to the explanations and modifications I have suggested, I think the court should advise the trustee to accept it.

*Decree entered March 22, 1882.* This cause came on to be further heard at the above term before the full court, for further instructions to the trustee in reference to the sales of the trust estate, and counsel for the several parties were heard thereon, and thereupon, upon consideration thereof, it is ordered, adjudged, and decreed :

That the said Chafee, as trustee and assignee, proceed to sell the estate at public sale by open competition to the highest bidder on the 4th day of May, 1882, at 12 o'clock noon, at Lyceum Hall, in the city of Providence, the estate to be put up at the upset price of $2,-880,000 ; upon the following terms, viz. :

First. The estate to be sold is all the right, title, and interest in the estate and every part and parcel thereof now held by Z. Chafee, as trustee and assignee under the deed of trust bearing date the 1st day of November, A. D. 1873, and under the several deeds of assignment bearing date the 6th day of April, A. D. 1874, from the A. & W. Sprague Manufac. Co. and others to the said Z. Chafee, and under the various transfers and other conveyances between the same parties or any or either of them, first deducting therefrom the necessary legitimate expenses of the trustee in and about said estate and the expenses of upholding his trust remaining unpaid to an amount not exceeding one hundred and ten thousand (110,000) dollars ; and all the right, title, and interest of the trustees under a certain deed of trust from the National Bank of Commerce in New York, bearing date the 14th day of February, A. D. 1881 ; subject to all existing liens and claims upon the same, including that of the Quidnick Company against the trust estate.

Second. Payments to be made as follows :

1st. One hundred thousand (100,000) dollars to be paid down as earnest money to said Chafee, at the time of sale, and if not paid estate to be immediately resold.

2d. Twenty-five (25) per cent. of the whole amount of purchase money, less said ($100,000) one hundred thousand dollars, to be paid to said Chafee, as trustee, on the 13th day of May, A. D. 1882, at 12 o'clock, noon, at which time the deed shall be placed as an escrow in the registry of the Supreme Court, county of Providence ; the purchaser to be then put into possession of all the real estate, machinery, and other personal property belonging to the

trust estate, *appertaining to and necessary for the running of the mills.*

*3d. The remainder of purchase money to be paid in four equal quarterly instalments thereafter, and to be upon interest at the rate of six per centum per annum from said 4th day of May, A. D. 1882, until paid; provided, however, in case Winthrop De Wolf, as receiver of the Franklin Institution for Savings, does not join in the deed under such sale, the pro rata dividends, of the whole amount bid, upon the mortgage notes originally turned out to said Franklin Institution for Savings, may be deducted from the purchase money, and the balance remaining after such deduction and payment of the (25) twenty-five per cent. as above provided, shall be the remainder to be paid in the four equal quarterly instalments as aforesaid.*

*4th.  Any failure to make either of the payments subsequent to said earnest money, for five days, to work a forfeiture of the contract and all payments made thereunder, the purchaser and all persons claiming or holding under him, if in possession, to be then deemed tenants at will, subject to the summary order of the court, without notice in the cause under which this sale is to be made; the purchaser to be at liberty to anticipate said payments or either of them; and when the whole amount of purchase money has been paid, the purchaser to be entitled to receive said deed from the registry of this court.*

*Third. Stocks and personal property other than that above specified to be retained by the trustee until he has received in the payments subsequent to the first (25) twenty-five per cent. the full value thereof; and if the parties cannot agree upon the value of the same, or any part thereof, the trustee to be at liberty to sell the same at public auction, and the net proceeds thereof to be applied toward the payment of the purchase money.*

*Fourth. The grantors in the above deed lying in escrow, or such of them as shall be necessary for the purpose, and the purchaser, may unite in a deed for the sale of any portion of the property for a sum which they may agree upon as a fair market value for the same, the net proceeds of any such sale to be received by said Chafee, and applied toward the purchase money under this sale in the order said payments shall become due.*

*Fifth.* The purchasers to assume and pay all taxes, assessments, and expense of insurance from the date of sale, and upon failure so to do, the trustee to have the privilege of making any or all of such payments, the same with interest to be added to the purchase money, and to be repaid to the trustee with the then next instalment.

*Sixth.* The deed to be a quitclaim in form already approved by the court and now exhibited, subject to such changes in the description of the estates as the court on application may direct.

That said Chafee advertise the time and place of said sale in accordance with the provisions of the trust mortgage.

That upon payment by the purchaser of the earnest money above provided for, said Chafee and the purchaser shall execute a written contract of sale and purchase of the property upon the above terms for the sum bid. That thereupon the deeds in the form hereto annexed and hereby approved shall be made and executed as provided in said terms of sale; the said Kimball, Robinson, and Jackson, as trustees, are hereby ordered to unite with said Chafee in the execution of said deed, which deed shall be delivered in escrow to the clerk of this court upon payment made according to said terms of sale, and shall be delivered to the purchaser upon full compliance with said terms of sale.

That said Chafee from time to time, as said purchase money is received by him, pay to the holders of the mortgage notes, excluding the notes originally turned out to said Franklin Institution for Savings, unless said De Wolf joins in said deed as aforesaid, upon presentation, pro rata dividends upon the face value thereof, reserving such amounts as may be reasonably necessary to meet incidental expenses.

All further orders and decrees are reserved, with leave to any party or to the purchaser to apply.

Annexed to the decree was a form of deed approved by the court.

In accordance with the foregoing decree Chafee offered the trust estates for sale May 4, 1882; and failing to obtain any bids for them postponed the sale to May 18, 1882, when he again failed to obtain any bids and adjourned the sale without day. After

each attempted sale he reported his doings to the court and asked for further instructions.

*May* 24, 1882. STINESS, J.   A brief review of this case will show the reasons for the order which the court must now make. The original decree declared a lien in favor of the Quidnick Company for so much of its funds as had been mingled with the trust estate, and for security, as it was impracticable to hold the property, directed a sale and deposit of the proceeds to await the account.   No directions were given as to the mode or terms of sale, which were left wholly to the trustee's discretion and the authority he already possessed under the trust mortgage to sell at public or private sale, in bulk or in parcels.   The trustee in December last was proceeding to carry out this order, by advertising to sell in parcels at auction ; but within a few hours of the appointed time of sale of the first piece of property, certain persons, claiming to be creditors under the trust mortgage, interfered to stop the sale by an injunction.   Pending a motion to dissolve this injunction, negotiations were had and offers made to the trustee for a sale of the entire property for a fixed sum, culminating in an offer to bid the highest amount named, at an auction sale.   These offers were communicated to the court, accompanied by petitions bearing the signatures of persons claiming to represent upwards of seven eighths in amount of the creditors, together with the approval in open court of counsel representing all the parties in interest, that the court should direct the trustee to accept one or the other offer.

These petitions, no one, after ample notice, appearing to object, together with the statements of counsel on both sides of the suit, showed clearly that, notwithstanding a lack of harmony among the creditors in other respects, there was a unanimous desire to have the property disposed of in bulk.

The trustee then presented to the court a letter addressed to him by the committee of creditors, containing the following suggestions:

" If we rightly interpret the reported statement made for the Supreme Court by the presiding judge at the hearing on the 11th instant, we infer that the court are desirous, in so far as they can properly act in the matter, that the property should be sold in a

mass to the party or parties making the best offer for it. Assuming that we are correct in this inference, we would urge that it is of great importance, in order to secure the highest price for the property, that all parties should have an opportunity to make their bids understandingly, on some definite terms to be fixed by you as to time and manner of payment and the title to be given. If each bidder is to be allowed to fix his own terms, it will prove difficult for you to decide as to the merits of various offers. We would, therefore, suggest that you apply at once to the court for authority to offer the entire property in one parcel at auction to the highest bidder, not to be sold, however, for a sum less than twenty-eight hundred and eighty thousand dollars, you fixing such terms of sale as shall *fully protect* the rights and interests of creditors."

In view of the apparent competition for the estate, this suggestion was not only a reasonable one, but the duty of complying with it was imperative; for we could neither disregard the unanimity of the creditors in regard to selling the whole at once, nor the fact of an offer to bid as proposed at an auction sale by a party whom the trustee certified to us he believed " to be reliable."

Recognizing the fact that the estate equitably belongs to the creditors, and that they, therefore, are entitled to say in what way their interests will be best subserved in its sale, and relying, as it is customary, and necessary to do in all matters of business, on the obligation of written promises and commercial honor, we advised the trustee to sell the estate at auction at the upset price offered, pursuant to the general request of the creditors as to a sale in bulk, and the particular request of the creditors, through their committee, as to the sale by auction.

While these matters involved no questions of law and are not strictly judicial, it nevertheless became necessary for the court to pass upon them ; because as all these offers provided for a partial payment in cash and for instalments to lie back, the trustee, upon the acceptance of either one of them, could not deposit the proceeds as at first directed without some change in the original decree. The whole matter was thus brought before the court, and upon the showing made the change asked for, appearing to be a

reasonable and proper one, the order of March 22, 1882, was entered.  In making the order the court has not undertaken to administer the trust nor to conduct the affairs of the trustee, but simply to carry out the almost unanimously expressed wishes of the creditors, both by their own petitions and through their committee, and at the same time to protect as best we could the interests of all parties before us and the lien which he had declared.

The trustee now informs us that the offer to bid at the proposed auction has failed.  Of course, then, our last order must be revoked, leaving the matter as it stood under our original decree, and as it would have remained, and doubtless long ago have been completed, but for the intervention of the creditors themselves.

Under that decree the trustee is free to sell in any of the ways authorized by the trust mortgage.  If, however, the creditors are still desirous that the property shall be sold in bulk, and the trustee shall receive a satisfactory offer of that kind, a proviso, to save the trouble of a new application, may be added to our original decree, authorizing the acceptance of such offer, upon terms substantially similar, except in amount, to those embodied in our order of March 22d.

*Decree entered May 24, 1882.  This cause came again before this court on the 24th day of May, A. D. 1882, upon the report of Zechariah Chafee, trustee and assignee, setting forth his failure to effect a sale of the estates mentioned in the decree of March 22, A. D. 1882, under the terms named in said decree, and that no bidder appeared to offer the upset price required by said decree to start the sale, and asking for instructions in the premises; and now, upon consideration of the facts set forth in said report, and of the cause, it is ordered, adjudged, and decreed :*

*First. That the said decree of March 22, A. D. 1882, be, and the same is hereby rescinded.*

*Second. The third clause of the order of this court entered November 5, A. D. 1881, is hereby revived and reëstablished, with the amendment striking out the words " upon its participation account," and adding the following : " Provided, however, that if said Chafee shall receive an offer for the entire estate for a price*

*satisfactory to him, he may sell the same at private sale upon terms
substantially similar, except in amount, to those embodied in our
order of March 22, 1882; and in case of such sale, the proceeds
received from time to time by the said Chafee may be distributed,
as was provided in said order of March 22, 1882.*

Chafee, the trustee, annexed to his reports setting forth the
failure to sell,.copies of letters received from Wilbour, Jackson &
Company, of Providence, as follows :

                                          "PROVIDENCE, R. I. *March* 3, 1882.
" Z.  CHAFEE, ESQ., *Trustee :*

" Dear Sir, — In case the Supreme Court should advise the sell-
ing of the Sprague estate at auction in bulk, at an upset price of
$2,880,000, we hold ourselves ready and will make a bid of this
amount to start the property, payments to be made on the terms
suggested to you by the creditors' committee in their letter of the
22d ultimo, and agreeing on our part to take such title as you can
give as trustee and assignee.    Will you please consider this confi-
dential, and oblige,
                     " Very respectfully yours,
                            " WILBOUR, JACKSON & CO."

                                          "PROVIDENCE, R. I. *May* 3, 1882.
" Z.  CHAFEE, ESQ., *Trustee, &c. :*

" Dear Sir, — We observe by the public papers that. you have
advertised a sale of the Sprague estates for May 4, 1882.

" Since the terms of sale as advertised are different from those
contemplated in our letter of March 3, 1882, and in consequence
of recent threatened complications of the estate, neither we nor
our associates will appear as bidders at the advertised sale.
                     " Very respectfully yours,
                            " WILBOUR, JACKSON & CO."

Chafee also made affidavit that Wilbour, Jackson & Co., March
3 or 4, and before a hearing which took place March 4, gave him
full authority to have their letter of March 3 read in court.

At the hearing March 4 the letter of March 3 was read to the
court.    This hearing was followed by the opinions of March 8,
and the decree of March 22 above given.                          ⟍

Thereupon the court ordered a citation to issue to Joshua Wilbour, Benjamin A. Jackson, Charles H. Sheldon, Junior, and William Binney, Junior, members of the firm of Wilbour, Jackson & Co., requiring them to show cause why they should not be attached for contempt of court.

They showed as cause that they were neither parties to the cause, nor witnesses, nor otherwise interested therein, that they had committed no contempt, and that they had neither impeded nor hindered any action of the court and its officers or the operation of any decree.

*June* 17, 1882. STINESS, J. The facts before us are these. The Quidnick Co. was declared to be entitled to a lien on the estate, held by the respondent Chafee in trust, for such amount as an account to be taken shall disclose to be due; the estate could not be held to await the account except at " great and ruinous expense," and the trustee was therefore directed to proceed to sell the property and deposit the proceeds, subject to the order of the court, as security for the lien. No mode of sale was specified; that being left to the discretion and responsibility of the trustee, but, in order to guard against any improper terms of sale, the order provided that either party to the suit might apply to the court for " directions to said trustee in relation to such sales." The trustee advertised the property for sale in parcels at public auction, without any objections or requests for directions, but just before the time of sale, on the petition of certain depositors in the Franklin Institution for Savings, the sale was enjoined by one of the justices of the court. Pending a motion to dissolve this injunction, negotiations were had and offers made to the trustee for a sale of the entire estate in bulk for a fixed sum, and under the terms of the decree before referred to, the trustee applied to the court for " directions " in respect to these offers, presenting petitions for an acceptance from a majority of the creditors. At the hearing another offer to the trustee, of a larger sum, was produced, and the court was asked by the complainant and numerous other creditors, embracing some who had signed the former petition and nearly all who had not, to direct the trustee to accept this latter offer of $2,880,000 for the entire estate.

Although such directions as these were of quite a different

character from those contemplated by the court when the original decree was entered, still as such a sale would necessitate some change in our former order as to the depositing of proceeds, we were compelled to consider the matter.   The smaller sum, having been proposed by the creditors' committee and assented to by so large a number, we assumed it to be their estimate of the value of the property, and if the trustee could secure no larger price than Mr. Lapham's, that being assented to by most, if not all, of the remaining creditors, it would be clear that this sum must be taken as the fair, if not full, value of the estate.   We, therefore, intimated to the trustee that if he should receive no "further and better offer" within three weeks, we should advise him to accept that one.   At the expiration of the time the trustee presented to the court, without reading the signature, the letter of the firm of these respondents.   Objection was made by the complainant's counsel to the consideration of an anonymous offer, whereupon the signature was read by the trustee's counsel and the name of the respondents' firm disclosed.   Whether the trustee was authorized to disclose the name is disputed, though from the statement of the respondents, we think with little reason, but the name was read and this fact was known to them.   It is evident that the contents of this letter at least were to be communicated to the court, for otherwise it could not be known that there was a "further and better offer."   As this offer was to bid the same amount previously named, at an auction sale, made by a well known banking firm in Providence, believed to be amply responsible, not perhaps for the full amount of the offer, but, at least, for its complete performance under the terms named, it was thought by the court to be a better offer than the preceding one, for the reason that it indicated a competition for the estate in a manner that would not bring less and might bring more than any other proposal.

The committee of creditors in a letter to the trustee urged him, with much force, in view of the apparent competition, " to apply at once to the court for authority to offer the entire property in one parcel at auction to the highest bidder, not to be sold, however, for a sum less than $2,880,000," under "such terms of sale as shall *fully protect* the rights and interests of creditors;" and as the respondents' offer was coupled with this suggestion, in its

exact terms, it was impossible, within reason, for the court to ignore it or to do otherwise than to advise the following of such a course.

Under the proposed terms of sale the trustee could not deposit the funds at once, as directed by the original decree, as a portion was to lie back to be paid in instalments, and consequently it was necessary to enter another order, directing the sale in the manner indicated, under such terms and conditions as would best secure the lien which we had before decreed to the complainant. Before this was entered it was submitted to the respondents by one of the committee of creditors, and assented to by them.

The draft of a decree presented by the trustee's counsel had in it a provision requiring the receiver of the Franklin Institution for Savings to join in a deed to the purchaser; but as no one had asked for this, and as it was not suggested or required either by the respondents' letter or that of the committee to which they referred, it was stricken out by the court, because we had no authority to order it, and because such an order would not be conformable to the terms of the respondents' offer. It was understood at the hearing that possibly Mr. De Wolf, the receiver, would come in under the offer and join in the deed; and that if he did not, claiming that he is not a mortgage creditor but a judgment creditor only, holding title under his levy, no dividend was to be made on the mortgage notes supposed to be held by him; nor was the amount of such dividend in such case to be distributed among the balance of the creditors. In other words, the basis of computation was thirty-three per cent. on the mortgage notes, and no one was to receive more than that. If Mr. De Wolf did not hold the notes, so much less would have to be paid, and the dividend upon them would stand, *pro tanto*, as an offset to his judgment claim; but whether he did or not it would make no difference to other holders. This provision was not incorporated in the respondents' letter, or in that of the committee which they made a part of theirs; but, as it had been understood to be a condition of all the offers, we allowed the draft to be changed to conform to this understanding, which change was wholly in the respondents' favor. No other change was made. The affidavit of Mr. Gardner stated that the draft was shown to

the respondents after the clause relating to De Wolf's joining in the deed was stricken out. The respondents claim that it was not; but it seems to us to be quite immaterial either way. If after, then they knew just what the decree was as settled by the court; if before, no one knew better than they that it was no part of their offer, that it did not belong there, and that its erasure would in no way alter the terms of their own proposal. Besides this, the entire decree, reciting the full terms of sale, was advertised within less than a week of its entry and up to the day of sale ; the respondents knew this, and, as they say, went to see De Wolf about it, and were all along endeavoring to find persons to aid them in carrying out their offer. May 3, 1882, the day before that named for the sale, the respondents sent a letter to the trustee, stating that since the terms of sale as advertised were different from those contemplated in the letter of March 3, 1882, and in consequence of recent threatened complications of the estate, neither they nor their associates would appear as bidders at the advertised sale. On the next day, May 4, 1882, the trustee offered the estate for sale as advertised, but no bid was made by the respondents or any other person. He then reported the state of things to the court, whereupon a citation was issued to the respondents to appear and show cause why a writ of attachment should not issue against them for contempt.

They have appeared, and in writing and under oath have declared that their offer was made in good faith ; have disclaimed any intention to impede, hinder, or obstruct the court, its officers, decrees, or proceedings, and have specifically set up :

1. That they have in nowise committed any contempt, in that they were not parties or witnesses or otherwise interested in the suit ;

2. That the offer would have been carried out had not other persons interested in the purchase withdrawn their support;

3. That there was a change in the decree, in the matter of De Wolf ;

4. That their names were disclosed without authority ;

5. That they had a right to withdraw from their offer.

Only the first and last of these grounds need any further consideration. The statement by the respondents, in one breath, that

the offer would have been carried out had not other parties withdrawn their support, and in the next that it could not be on account of the change in the decree, are quite inconsistent, and indicate that the former and not the latter was the real reason of the non-fulfilment of their promise.  In view of the facts we have stated, this last excuse seems to us to be a pretext as puerile and frivolous as the offer itself was baseless and unsubstantial.  The matter of the presentation of the letter has already been sufficiently referred to.  The questions remaining then are these : has there been a contempt of court, and in what did it consist ?

Blackstone, 4 Comment. 283, recognizes two classes of contempt: *direct*, or those " which openly insult or resist the powers of the courts ; " and *consequential*, or those " which, without such gross insolence or direct opposition, plainly tend to create a universal disregard of their authority."

It has been held that anything done for the purpose of obstructing justice, or which will have that effect, is a contempt. *Rex* v. *Clement*, 4 B. & A. 218, 233.

In *Executors of Brasher* v. *Cortlandt*, 2 Johns. Ch. 505, where a purchaser at committee's sale bid from friendship to another, who, having taken an appeal in the proceedings, advised respondent that he need not complete the purchase, he was ordered to pay the purchase money or an attachment would issue.  Chancellor Kent remarked : " If no order of this kind could be made in this case, it would follow that not only the purchaser but the committee of the lunatic would be permitted to baffle the court and sport with its decree."

In *Gilmore* v. *Gilmore*, 40 Me. 50, the defendant professed his readiness to pay certain notes, when he could do so with safety, claiming no abatement of the sum apparently due, and a receiver was appointed to collect them.  The defendant then refused to pay unless an allowance was made for an amount which he claimed had been previously paid, whereupon the court ordered an attachment, saying : " This refusal to pay his note to the receiver has the appearance of a disposition to palter with the authority of the court, if not to practise a fraud upon those who are interested in the proceeds of the property in his hands.  Such a course can neither be approbated nor permitted."

In *Fischer* v. *Raab*, 56 How. Pr. 218, where a party in open court agreed to pay the expense of a reference in a certain event and the event occurred; on refusal to pay he was held to be in contempt.

So in *Lansdown* v. *Elderton*, 14 Ves. Jun. 512, a purchaser at a master's sale failed to pay in his money and was ordered to be committed to the Fleet, on the ground that a purchaser "could not be permitted to baffle the court and disobey an order, more than any other person."

These precedents, from many, are sufficient to bring out the principle, that an act which tends directly to hinder and obstruct proceedings under the order and authority of the court, or which indicates trivial and paltering dealing with the court in affairs which are before it, is an act in contempt.

Courts of equity in all cases have to deal with the rights of parties, securing to one that which is his due and protecting another from that which would tend to injury. They must deal with interests in the light of the facts that are before them, following such things as seem to be to the advantage of those concerned, and avoiding such as seem to be to their disadvantage. Now if persons could make, with impunity, insincere or irresponsible representations, upon faith in which the court is called upon to act and does act, we should soon find that legal proceedings would be a snare instead of a safeguard, and endeavors to secure the rights of parties would prove a mockery instead of a reality.

In the present case a large estate was to be sold for the benefit of creditors, under the order of the court. If sold otherwise than for cash, the permission of the court had to be obtained and its former order modified. The creditors' committee urged the trustee to ask for an order to sell at auction at an upset price, and with this request came the respondents' letter, in the manner stated.. Upon such a showing there seemed to be no choice as to the course which must be taken. There was no suggestion from any quarter that this was an irresponsible offer, or one not likely to be carried out. In fact the only objection made to it was in the opinion of Judge Potter, upon the ground that, as it offered no more than the preceding one, it was not a better offer, saying :

" If the firm of Wilbour, Jackson & Co. had, within the time fixed, pledged themselves to bid at auction $100,000, or even $50,000, over and above the Lapham offer, I should have thought it the duty of the court to try the experiment for the benefit of creditors.   But they have not done it."   Nevertheless it seemed to the court that the proposal was a better one, in that it promised that the estate should not bring less than had been offered for it, while it might bring more; to say nothing of differences in regard to guaranties of title.

We relied on the representations of the respondents; and they must have known this fact, as well from the course of the proceedings as from the published opinions of the court.

They now say that the parties whom they expected would assist them declined to come in, and that they were unable to fulfil their offer.   It therefore appears that, unable of themselves to carry out their own proposal, they had no binding assurances of agency or assistance from other parties, but were simply expecting aid and thus adventuring with the estate.   We can see no excuse for this ; certainly, if there be any, it has not been shown.   True the respondents say they made their offer in good faith, supposing they would be able to carry it out, and with no intention to hinder the proceedings of the court.   This we readily believe, but this is not enough.   What reasonable grounds they had for their expectations they have not seen fit to state, and it is evident that their failure could not reasonably have come from any of the grounds they have stated.

· · Contempt of court lies in the quality of the act done, and not in the intention of the person doing it.

Chief Justice Taney stated this in *Wartman* v. *Wartman*, Taney, 362, 370.   " As regards the question whether a contempt has or has not been committed, it does not depend on the intention of the party, but upon the act he has done."

We may therefore assume that the respondents made their offer in entire good faith, and with confident expectation of their ability to raise the necessary funds to carry it out.   We do not say that the mere failure to perform an offer so made is, in itself, a contempt, for there may be many cases in which circumstances would abundantly excuse it ; but if the respondents knew, at the outset,

that they were not able of themselves to carry out their undertaking and had no sufficient authority from others, but were groping in vague hope, this certainly was a trifling with the court amounting to contempt.

And it makes no difference, as the respondents urge, that they were not parties to the suit before us. They voluntarily placed themselves before the court. Their letter was to be used to influence its action. Whether it was read with or without authority they did not repudiate the disclosure, but left the court and parties to suppose that it was authorized, not only for the space of nearly three weeks prior to the entry of the decree, but even down to the hearing on this citation. We therefore regard them as voluntarily before the court for the purpose of inducing specific action in discretionary proceedings.

That persons not parties to a suit may be held for contempt is well established.

An editor of a newspaper has been fined for contempt in publishing proceedings contrary to an order of the court. *Rex* v. *Clement*, 4 B. & A. 218.

A member of the House of Commons who had carried off his infant daughter, a ward of the court, from the house of the ladies under whose care she had been placed by the guardians appointed by the court, and who, on being examined by the court, admitted the fact and refused to state where his daughter was, was ordered to be committed to the Fleet, although not a party to the suit. *Wellesley's case*, 2 Russ. & M. 639.

Where a railroad was in the hands of a receiver, the employees of another road, who had "struck," prevented employees of the receiver from working, and were adjudged to be in contempt. *Secor* v. *Toledo, P. & W. R. R. Co.* 7 Biss. 513 ; *King* v. *Ohio & M. R. R. Co.* 7 Biss. 529.

It would indeed be strange if any one could impede judicial proceedings, without being called to account, simply because he was not a party to a suit, or was not in the immediate presence of the court.

The respondents further claim that at most their letter was but an offer which they had the right to withdraw at any time before the sale.

That is a matter that cannot be decided in this proceeding, which involves, not their civil liability as for a contract, but only the question whether they have trifled with the court by making an offer which they did not know they could perform.

If the sending of a letter to the trustee, to be used in court to secure an offer of the trust estate at auction, promising in that event to bid a certain sum, the writers not being able at the time and not knowing that they would be able to fulfil their promise; if, on the faith of such letter, a sale at auction is ordered on the terms named, involving a delay of several weeks to the parties, and large expense in advertising and care of the estate in the mean time, while down to the day before the sale they are silent, seeking persons to join them in a speculation, and then without adequate excuse they abandon their undertaking; if this is not to " baffle the court and sport with its decree," it is difficult to conceive what would amount to that.

We are of the opinion that the conduct of the respondents was unwarrantable, and we therefore adjudge them to be in contempt. Believing, nevertheless, that they had no intention to hinder the proceedings of the court, but were under an honest though mistaken and unfounded belief that they could fulfil their promise, we think that this should be considered.

At our request the trustee has submitted a sworn statement of the expenses of advertising, and care of property awaiting sale, &c., directly incurred by reason of the delay which the respondents have caused, amounting to $7,877.03.

Omitting the item of office labor, there remains, in round numbers, $7,500, as the immediate outlay.

While we make no ruling and express no opinion as to the civil liability of the respondents to make good this or any other damage as upon a contract, still it is quite reasonable and proper that they should at least reimburse the trustee for these expenditures; for there can be no question that they were occasioned by what the respondents did, and the loss in these respects is none the less real because it was unintentional. Fair dealing frequently moves men to make some recompense for injurious acts which they may not consider themselves responsible for in law.

If, therefore, the respondents see fit before Saturday next to

pay to the trustee the last named sum by way of immediate reimbursement; such payment not to be taken as any admission of liability for any other or further sum on the one hand, nor as a bar to, or satisfaction for, any suit or claim for other or further damages on the other; and to pay to the clerk of this court the taxed costs on this citation, we shall regard that as a sufficient purging of contempt, and they will be dismissed from further attendance. Otherwise, on Saturday next, the clerk will issue a writ of attachment.

After the foregoing opinion the firm of Wilbour, Jackson & Co. filed with the court a brief to the effect:

1. That they acted as bankers and brokers and not for themselves, and their agency was understood by all parties interested.

2. That the effect of their action was favorable and not detrimental to the sale of the Sprague estates.

3. That the court should delay action until final sales of the Sprague estates.

4. That, acting in good faith, they have already been sufficiently punished by the censure of the court.

They also claimed that proceedings for contempt were confined to the two cases:

1. Of acts of violence or insolence, when the court would proceed of its own motion.

2. Of disobedience on the part of parties, or their attorneys and agents, when the court would proceed only on complaint of the party injured.

They also July 11, 1882, filed the following:

QUIDNICK COMPANY,  
        vs.                      SUPREME COURT,  
Z. CHAFEE, Trustee.           March Term, A. D. 1882.

In the matter of the proceeding against Wilbour, Jackson & Co. for contempt.

The respondents now, as heretofore, disavowing any conscious act of disregard for, or want of respect to the court, its orders, or proceedings, respectfully decline to make the payment to Z. Chafee, trustee, as suggested by the court in their decision and order made

on June 17, 1882. In so doing they trust the court will consider their refusal justified for the following reasons:

*First,* that this court is the only tribunal to pass upon Mr. Chafee's claim against them for damages, if such claim be made.

*Second,* that in their own judgment, and that of very many advisors, such payment, however intended by the court, would be an admission of liability for damages which they cannot justly make.

For these and other reasons they feel that they must decline to exercise the option given them, regretting that any further burden should be put upon the court in this matter.

Respectfully submitted, WILBOUR, JACKSON & Co.

By their attorney, EDWIN METCALF.

*July* 11, 1882. STINESS, J. As the respondents have, with the permission of the court, filed a brief in this matter, it is proper that we should refer to it. By the opinion which we have already given we held that the respondents had been guilty of contempt on the grounds therein stated. We did not form or express any conclusion upon the civil liability of the respondents to the trustee, but explicitly refrained from so doing. Neither did we order them to pay any sum of money to the trustee, but simply stated that if they should see fit to make reparation for the expenses that had been incurred by reason of their letter, in evidence of their good faith, the court would require nothing further, and would not proceed to impose the penalty provided for by statute. It is a very common thing in cases of contempt for courts to require some reparation to a party who has suffered loss, whether it has been intentional or not, and whether there is a civil liability for the loss or not. Not to mention others, two notable instances have occurred within a few years in our own State.

In *Goodyear* v. *Providence Rubber Co.,* in the United States Circuit Court in this district, the defendants were enjoined from manufacturing rubber goods in infringement of the complainant's patents. It was claimed that they had made a lease of their factory to other parties, who formed a company and continued the manufacture. They were held to be in contempt, and Mr. Justice Clifford ordered a writ of attachment to issue unless the respond-

ents should pay into the registry of the court, within a specified time, the sum of $175,000 in money or bonds, to answer the exigencies of the final decree.

In *Hazard* v. *Durant*, in the Supreme Court of this State, 11 R. I. 195, the defendant having been adjudged guilty of contempt in receiving a dividend in violation of an order of the court (by Mr. Justice Potter), was allowed to purge himself of the contempt by giving a bond in the sum of $95,000, with satisfactory sureties, to make good an account to the complainant. The bond was not given, and the respondent made several motions to purge himself from contempt on the ground that it had not been intentional, setting forth various matters in justification of what he had done. At the last hearing the court, Durfee, C. J., said, with reference to this point : " The third ground is that the contempt was not intentional. We should look with more favor on this ground if the petitioner when found guilty had made all the reparation he could." After referring to certain facts the court said further, " We must refuse to relieve him from his contempt upon the ground that it was not intentional. Other grounds are assigned, but they are not such, in our opinion, as entitle the petitioner to be purged of his contempt without giving bond as required by the previous order of the court."

While it would thus seem that we might properly have required these respondents to pay the expenses referred to, we did not do so for two reasons : first, in view of other claims for damages that might be brought against them in civil actions, we were not willing to appear to hold them liable for any damages, and therefore left that matter simply as an optional and voluntary act of reparation ; and secondly, in deference to their statement that they were not intentionally in contempt, the only way they could be relieved from the opprobrium of a penalty was by some act of reparation, in evidence of their good faith. The smallest amends in such a case would seem to be the payment of the actual outlays occasioned, and we therefore suggested that. We did not fix the amount, that was fixed by the facts ; and surely the sum of $7,500 could not be deemed excessive in view of the facts that other offers had provided for the payment of $10,000 as earnest money.

The respondents now file a paper in which they decline to make the reparation suggested, and the court therefore can only impose the statutory penalty. They also file the brief referred to, which we will now consider.

They seem to imply, though they do not in so many words state in their brief, that the court has dealt with this matter in some new and hitherto unheard of way, or has assumed some new and hitherto unheard of power. This is not correct, as the cases cited in our opinion, and many others that might be named, abundantly show.

Again they claim that acts of contempt are only included in acts of violence, &c., in the presence of the court, or in disobedience of orders of the court by parties to a suit or their agents. This is not correct. The cases cited by the court in its opinion show the contrary, and the cases cited on the brief, to which we will refer in detail, do not support the points they claim. It is true that cases of contempt most frequently arise from acts done in open court, or from the acts of parties in violation of orders, because outsiders seldom intervene ; but it by no means follows that these are the only cases of contempt.

The first case to which the respondents refer, *King* v. *Ohio & M. R. R. Co.* 7 Biss. 529, was cited in the opinion of the court. In that case certain railroad men on a "strike" interfered with the employees on a road in the hands of a receiver, and they were held to be in contempt and punished by imprisonment. Their acts were not done in the presence of the court, they were not parties to any suit before the court, nor were they under any order of the court. This case, instead of supporting the respondents' point, establishes exactly the opposite.

*Watson & Gallup* v. *Fuller & Wadsworth*, 9 How. Pr. 425, has no relevance to this matter whatever. It simply holds that "an *injunction* order can only go against a party to the action" under a provision of the Code.

*Sickels* v. *Bordens*, 4 Blatchf. C. C. 14. An act of Congress required notice of an application for an injunction. Certain defendants were discharged upon the ground that they had not violated the injunction ; but the chief engineer of a steamboat, having violated the injunction served on him as a defendant in a suit, it was held to be no defence to a motion for an attach-

ment against him for such violation that he was a mere servant of a corporation, and subject to the orders of the master of the steamboat.

*Buffum's case*, 13 N. H. 14. It was held that it is not a sufficient excuse for a party who refuses to perform a decree in equity that he acted under advice of counsel. Also that an attachment for contempt, arising out of a refusal to perform a decree in equity, is not a criminal proceeding to punish disobedience by a fine to the use of the county, because no statute of the State authorized it; but it is a remedial process for the benefit of the party obtaining the decree.

*In re Hirst*, 9 Phila. 216. An attorney was charged with procuring fraudulent bail. As it was denied and the proof was not clear, and as subornation of perjury and a conspiracy to impose on the court by the production of fraudulent bail were indictable offences, the proceedings in contempt were dismissed, and the evidence certified to the district attorney for use before the grand jury.

*State* v. *Lonsdale*, 48 Wis. 348. "The head notes relating to this branch of the case are as follows: ' While the power to punish for contempt was not conferred in the first instance by statute but is inherent in the court, yet when a statute prescribes the procedure in a prosecution for contempt, or limits the penalty, the statute controls.' "

" The power of the court in any case to award indemnity to an injured party in a summary proceeding as for a contempt, rests entirely upon the statute, and the ' loss or injury ' for which the court may award compensation is a pecuniary loss or injury for which the party injured might recover damages by an action." This question came up on punishing a recusant witness.

*Weeks* v. *Smith*, 3 Abb. Pr. 211. The statute provided that the Supreme Court of Brooklyn might punish as for a criminal contempt persons " guilty of wilful disobedience to any process or order," and the court simply found that the acts done were not forbidden by the order of the court.

After careful consideration we see nothing in any of these cases, most of which had been examined by us before giving our opinion, nor in any other cases of which we know, that is at all in conflict

with our decision, or that furnishes any reason for us to change or modify that decision. In several of the cases we fail to see any relevance to the point in issue. So far as the law is concerned, therefore, we are satisfied that our opinion was correct.

The respondents also call our attention to certain facts set forth in their brief. *First*, that they were acting as brokers or bankers for others and not as principals. Nothing of the kind appeared in their letter, which purported only to be a purely personal undertaking; nor, in the ample opportunity that has been afforded them to place before the court everything that might bear upon this matter, have they mentioned a single person for whom they were acting. In testimony they said they were looking for persons to aid them, even down to the day before that appointed for the sale. If they had shown to the court that they were proceeding under such assurances of aid or agency as in ordinary important business matters would have been considered justifiable, that fact would have been entitled to attention; but there seems to have been a studied silence on that point. *Second*, they say they have " already been acquitted of intentional trifling or bad faith." The court has not said quite that. We said explicitly that what they did was a trifling with proceedings before the court. The respondents said that what they did was in good faith. We were quite willing to accept that statement and assume the fact, but added that a good intention only was not a sufficient excuse in such cases.

They also say that the " Sprague estate is probably in no sense injured by their action in the premises, and the creditors or their trustee are none the poorer." If this be a " fact," it is one of which there is no evidence, and one not so apparent on the face in things that we can foresee it. It is true that this statement is somewhat qualified by the third point, which says, " The final sales of the estate can alone determine this." We see nothing in these " facts " to alter our previous opinion. In that, we assumed the good faith of the respondents, and from that very ·assumption supposed that reimbursement for expenses actually, though innocently, caused, would be as acceptable amends to fair dealing men as it would be satisfactory evidence to the court of the absence of trifling or paltering conduct. If we have mistaken the stand-

ard of commercial ethics, and the respondents prefer to leave that matter solely to the test of civil liability, they have the right under our opinion to do so.  The only alternative for the court, however, in such a case, is to impose one of the statutory penalties.

To this point the court is agreed in opinion.  Upon the questions what that penalty should be or when it should be imposed, we are not yet agreed.  For my own part, I am free to say that I see no reason for further delay, and I think a fine should now be imposed.

Judge Tillinghast, however, is of opinion that future results, or further efforts to be purged of contempt, may properly be awaited.

On account of this difference the issuing of a writ of attachment will await the further order of the court.